183 F.3d 122 (2nd Cir. 1999)
 UNITED STATES OF AMERICA, Appellant,
v.
ROCCO F. GUADAGNA; MARVIN BARBER; LAUREL BENBOW; BRIAN BERARDINI; RICHARD BOOTH; CHEO BURROUGHS; BERNADETT "RENEE" CRAWFORD; LARRY DAYER; ANTHONY "TONY" GARAM; ANTHONY LOUIS GUADAGNA; ANTHONY "TONY" HACKETT; JAMES "JAMIE" HAYNES; DONALD IVEY; ROGER LEEPER; CARL LOMANTO; MELVINA MARKAJANI; THEODORE POWELL; SAMUEL RINGWOOD; CHARLES ROBBINS, SR.; STEVEN SACCO,"also known as Steven Roberts"; KYLE SALONE; KEVIN SANDERS; FRANCIS MICHAEL "MIKE" SAWICKI; JOHN SUPPA; JUDE WATKINS; LESLIE WILLIAMS; and EDWARD ZACCARIA, Defendants,
THOMAS MULLEN, Defendant-Appellee,
and
JOSEPH MELI, Defendant-Appellant.
 Docket Nos. 98-1106, 98-1146.
August Term 1998
 UNITED STATES COURT OF APPEALS
SECOND CIRCUIT
 Argued March 25, 1999.
Decided July 06, 1999.
 
 Appeal from judgment of the United States District Court for the Western District of New York, Skretny, J., granting defendant Mullen's motion for judgment of acquittal notwithstanding the jury verdict of guilty on counts 6 and 25 of the indictment.
 
 
 1
 Reversed in part and affirmed in part.[Copyrighted Material Omitted]
 
 
 2
 KEVIN W. SPITLER, Kenmore, NY, for Defendant-Appellant Joseph Meli.
 
 
 3
 ANTHONY M. BRUCE, Buffalo, NY, Assistant United States Attorney for the Western District of New York (Denise E. O'Donnell, United States Attorney for the Western District of New York, of Counsel), for Appellant United States of America.
 
 
 4
 PATRICK J. BROWN, Buffalo, NY (LoTempio & Brown, P.C., of Counsel), for Defendant-Appellee Thomas Mullin.
 
 
 5
 Before: FEINBERG, PARKER and POOLER, Circuit Judges.
 
 FEINBERG, Circuit Judge:
 
 6
 The United States appeals from a judgment of the United States District Court for the Western District of New York, William M. Skretny, J., granting defendant Thomas Mullen's motion for judgment of acquittal, pursuant to Fed.R.Crim.P. 29(c), on two counts charging wire fraud. The district court found that, even when viewed in the light most favorable to the government, there was an absence of proof as to Mullen's intent to defraud for the acts charged in those two counts. For the reasons set forth below, we reverse as to one count and affirm as to the other.[1]
 
 I. Background
 
 7
 We view the evidence in the light most favorable to the government and draw all reasonable inferences in its favor. United States v. Nersesian, 824 F.2d 1294, 1302 (2d Cir. 1987). In light of this standard, a rational juror could have found the following from the evidence presented at trial:
 
 
 8
 The criminal case against Mullen grew out of the investigation into the activities of Rocco F. Guadagna, one of Mullen's co-defendants.[2] Guadagna owned five corporations,[3] collectively called "RFG Group" by the government, all of which engaged in sweepstakes telemarketing. Between January 1991 and March 1992, Mullen worked for RFG Group in a variety of management and sales positions.
 
 
 9
 Through its various corporations, RFG Group marketed an assortment of products -- water and air filters, vitamins, fire retardant spray, cosmetics, cleaning supplies and promotional items, such as pens and key chains -- using one basic scheme: sales people cold-called potential purchasers and told them that they had been selected for a special promotion by the product's "sponsor." If the sales person reached someone who was willing to listen, the sales person would then begin the pitch. The potential customer was told that he or she had been chosen to participate in an expensive promotion that entitled the customer to a valuable prize, to be determined at random. Before any product was even mentioned, the sales person described the various prizes, which included some combination of a new car, a Hawaiian vacation, art, a big screen TV, a substantial cash award and jewelry. The salesperson then explained that because the promotion was so expensive, the sponsor asked that the customer listen to a sales pitch for the sponsor's product.
 
 
 10
 Although the sales person never explicitly said that a purchase had to be made for the customer to be entered in the contest, the sales pitch was intentionally worded to imply that such a connection existed. And since the real purpose of the calls was to sell RFG Group products, not to notify anyone of a special promotion by a non-existent "sponsor," most of the call focused on strongly urging the customer to make a purchase. The pitch book used by the sales people contained many pages of rebuttal script, used to overcome customer objections to purchasing any product to win a prize. Only one paragraph in the pitch script, which covers 32 pages in the joint appendix, acknowledged that there was no requirement that a person purchase anything to have access to the "valuable prizes," and this portion of the script was apparently not read to the customer except in response to a customer who "elected" not to purchase a product but wanted the bonus.
 
 
 11
 Such extensive effort might not normally be necessary to sell cosmetics or cleaning products, as these products are relatively inexpensive and successfully sold by many retailers and wholesalers without recourse to sweepstakes promotions. However, RFG Group was at a competitive disadvantage, as its products were sold at an enormous mark-up from their wholesale cost. For example, RFG sold a six-month supply of vitamins for between $259 and $399, even though the vitamins cost RFG less than $12; RFG sold the Pure-N-Simple Water Filter for between $499 and $799, although it cost them only $56; and RFG sold a one-year supply of Valentina skin products for between $599 and $899, after purchasing that quantity for $81. Because the products were so expensive, RFG Group sales people had to lead customers to believe that the prizes for which they were eligible were worth at least the cost of the products purchased.[4] The sales people suggested that the prizes were so valuable that the products were actually a bargain.
 
 
 12
 In fact, although the prize list did contain prizes that were worth more than the prices charged for the products, the valuable prizes were never randomly awarded to customers. Although customers were often led to believe that they had already won the most valuable of the listed prizes, in fact the only prizes randomly awarded were those worth little more than the products. The vacation prize was actually a certificate for lodging at a motel in Hawaii, worth about $45; the jewelry was a diamond pendant worth about $90 or a diamond and sapphire tennis bracelet worth about $40-50; and the art was a $47 lithograph or a ceramic dolphin statue. Cars, cash and big screen televisions were never randomly awarded,[5] despite sales pitch promises to the contrary.[6] And atleast some of the employees of RFG Group became aware of this fact during the course of their employment -- Mullen admitted to an FBI agent in April 1994 that he thought the customers only received the cheapest prizes.
 
 
 13
 RFG Group perpetrated its fraud through a sales force primarily composed of "front sales representatives" or "fronters." Fronters were the sales people who cold-called potential first-time buyers using leads purchased by RFG Group from other sources. Fronters made between 100 and 200 calls per day, with between 15 and 30 of the calls resulting in sales presentations. About one out of every 15 to 20 sales presentations ended with a successful sale. Fronters usually sold between $499 and $799 of products per successful call.
 
 
 14
 After a customer agreed to a purchase, the fronter would complete a sales invoice and send it to the verification department. A "verifier" would then contact the customer, and in a taped conversation review the order and confirm that the customer had in fact agreed to the purchase. The purchase was then shipped with a "letter of guarantee" listing the bonus prizes that the sales person had described during the sales call. The prize for that customer was concealed by a foil seal. However, there was nothing random about the prize behind the foil. All first time purchasers received the same letter of guarantee and the same bonus prize.[7] The real purpose of the letters of guarantee was to keep track of which company name had been used on a sale and how many times a customer had purchased.[8] This information was valuable to RFG Group sales people in determining how much to try to sell to the customer the next time they called that person to "reload" them.
 
 
 15
 "Reload" or repeat sales constituted the real profit center for RFG Group. These sales were generated by a select group of elite sales people called "reloaders." The reloaders contacted past customers and attempted to sell them additional RFG Group products. A more specialized reload sales force, called "90-day salers," contacted reload customers 90 days after the last unsuccessful attempt to make a reload sale to them. All this effort went into reload sales because repeat sales were typically for far greater amounts than fronter initiated sales. Therefore, only the best salespeople were promoted to reload sales positions.[9]
 
 
 16
 As already indicated, Thomas Mullen worked for RFG Group for about 14 months -- from mid-January 1991 through mid-March 1992. At this time Mullen was in his mid-to-late 20s. However, he was not new to the industry and, by industry standards, he was not young. Prior to working at RFG Group, Mullen had worked for Vita Systems, another telemarketing company in Buffalo. Apparently, he was good at his job, because at some point in late 1990 he was recruited by RFG Group to work as a shift manager. Mullen's own brief to this court described his initial job at RFG as an entry level management position. And given the age of the people around him -- most employees were in their early 20s, with some as young as 16 or 17 and still enrolled in high school -- it is not surprising that someone relatively young would be found in a management position.
 
 
 17
 As a manager, Mullen had a variety of responsibilities. In addition to supervising 20-25 fronters, Mullen also supervised "monitors," RFG Group employees who listened to the fronters' sales pitches in order to identify misrepresentations.[10] Mullen also occasionally did "take overs" for fronters, which involved taking a call from a fronter and trying to "close" or complete the sale. In fact, Mullen was so good at closing sales that he authored that part of the pitch book, called "V.I.P.'s 13 `Guaranteed to Close'm' Close$." See note 4 supra. As a manager, Mullen also apparently had the power to hire and fire employees and to promote them within the company. Later in his tenure at RFG Group, Mullen became a sales person. Mullen was part of the elite reload sales force, where he worked on the "cancel sales" and "90-day sales" teams.
 
 
 18
 In June 1995, Mullen and 28 co-defendants were charged in an 88-count indictment for various crimes related to fraudulent sweepstakes telemarketing.[11] Mullen was indicted on four counts, all of which were submitted to the jury. Count one charged Mullen, along with all of his co-defendants, with conspiracy to commit mail and wire fraud in violation of 18 U.S.C. §§ 371, 1341 and 1343. Counts six, 24 and 25[12] charged Mullen with substantive acts of wire fraud in violation of 18 U.S.C. §§ 1343 and 2. Count six charged him with intentionally defrauding Phyllis Birckbichler of Shelby, Ohio. Ms. Birckbichler testified at the trial about the sales conversation she had with Mullen. Count 24 charged Mullen with intentionally defrauding a woman known only as "Ethyl" from Illinois. This count was supported by an audio tape containing a significant part of the sales conversation between Mullen and Ethyl. Count 25 charged Mullen with intentionally defrauding an unidentified woman from Ohio. This count was supported by an audio tape containing a fragment of a sales conversation between Mullen and the unidentified woman. The jury returned verdicts of not guilty on counts one (conspiracy) and 24 (Ethyl), but found Mullen guilty of the two acts of wire fraud charged in counts six (Birckbichler) and 25 (unknown woman).[13]
 
 
 19
 In June 1997, Mullen moved pursuant to Fed.R.Crim.P. 29(c) for a judgment of acquittal notwithstanding the jury verdict or in the alternative for a new trial on counts six and 25. In a Decision and Order dated January 26, 1998, the district court granted Mullen's motion for a judgment of acquittal on the two counts, finding that there was an absence of proof as to Mullen's specific intent to defraud. See United States v. Mullen, No. 95-CR-97S-18, at 6, 10 (W.D.N.Y. Jan. 26, 1998).
 
 II. Discussion
 A. Jurisdiction
 
 20
 We have jurisdiction over this appeal pursuant to 18 U.S.C. § 3731, which grants appellate jurisdiction over criminal appeals. Although the Double Jeopardy Clause severely limits appellate review of acquittals, it does not bar review of an acquittal based upon insufficiency of the evidence granted after a jury verdict of guilty. United States v. Covino, 837 F.2d 65, 67 (2d Cir. 1988). There is no bar because further proceedings require no additional fact- finding, and therefore the defendant will not be subject to additional jeopardy. See United States v. Wilson, 420 U.S. 332, 352 (1975). Because, as will be seen below, we hold that the district court erred in granting defendant's motion for judgment of acquittal on count six, we may simply direct the court to reenter the verdict of guilty as to that count. This government appeal is therefore not barred by the Double Jeopardy Clause.
 
 D. Standard of Review
 
 21
 We review de novo the district court's finding that the evidence presented at trial was insufficient to support the jury's verdict. United States v. Wallace, 59 F.3d 333, 338 (2d Cir. 1995). We apply the same standard on appeal as the district court applied in its review of the evidence. United States v. Hernandez, 146 F.3d 30, 32 (1st Cir. 1998).
 
 
 22
 In considering a motion for judgment of acquittal, the court must view the evidence presented in the light most favorable to the government. Jackson v. Virginia, 443 U.S. 307, 319 (1979); United States v. Puzzo, 928 F.2d 1356, 1361 (2d Cir. 1991). All permissible inferences must be drawn in the government's favor. Id. In addition, the court must be careful to avoid usurping the role of the jury. As we noted in United States v. Mariani, 725 F.2d 862, 865 (2d Cir. 1984), upon a motion for judgment of acquittal, "the Court `must determine whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt.'" Id. (quoting Curley v. United States, 160 F.2d 229, 232 (D.C. Cir. 1947)). Rule 29(c) does not provide the trial court with an opportunity to "substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury." Id. In fact, if the court "concludes that either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, [the court] must let the jury decide the matter." Curley, 160 F.2d at 233.
 
 
 23
 In order to prove a defendant guilty of wire fraud, the government must establish the existence of a scheme to defraud, that money or property were the object of the scheme, and that defendant used interstate wires in furtherance of that scheme. United States v. Zagari, 111 F.3d 307, 327 (2d Cir. 1997). Essential to a scheme to defraud is fraudulent intent. United States v. D'Amato, 39 F.3d 1249, 1257 (2d Cir. 1994). It is not sufficient that defendant realizes that the scheme is fraudulent and that it has the capacity to cause harm to its victims. United States v. Gabriel, 125 F.3d 89, 97 (2d Cir. 1997). Instead, the proof must demonstrate that the defendant had a "conscious knowing intent to defraud . . . [and] that the defendant contemplated or intended some harm to the property rights of the victim." United States v. Leonard, 61 F.3d 1181, 1187 (5th Cir. 1995) (internal quotations omitted).
 
 
 24
 However, direct proof of defendant's fraudulent intent is not necessary. Intent may be proven through circumstantial evidence, including by showing that defendant made misrepresentations to the victim(s) with knowledge that the statements were false. United States v. Smith, 133 F.3d 737, 743 (10th Cir. 1997). "Misrepresentations amounting only to a deceit are insufficient," United States v. Starr, 816 F.2d 94, 98 (2d Cir. 1987), as "the deceit must be coupled with a contemplated harm to the victim." Id. However, "[w]hen the 'necessary result' of the . . . scheme is to injure others, fraudulent intent may be inferred from the scheme itself." D'Amato, 39 F.3d at 1257. Therefore, a jury may bring to its analysis of intent on individual counts all the circumstantial evidence it has received on the scheme and the purpose of the scheme in which the defendant allegedly participated.
 
 
 25
 When making a case based on circumstantial evidence, the government need not "exclude every reasonable hypothesis other than that of guilt." Holland v. United States, 348 U.S. 121, 139 (1954); see also Puzzo, 928 F.2d at 1361. Further, the Curley test must be applied to the totality of the government's case and not to each element, as each fact may gain color from others. United States v. Monica, 295 F.2d 400, 401 (2d Cir. 1961). In other words, the court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is "nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." United States v. White, 673 F.2d 299, 301 (10th Cir. 1982). The jury verdict must be upheld if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Resto, 824 F.2d 210, 212 (2d Cir. 1987).
 
 C. Evaluating the Evidence Against Mullen
 1. Count Six
 
 26
 Count six charged Mullen with wire fraud based on a phone call made to Phyllis Birckbichler in March 1992. Ms. Birckbichler testified at Mullen's trial on behalf of the government. During direct examination, she testified that when she received the call from Mullen, she had already made three purchases from V.I.P. for $1259, $660, and $1829. However, she had received sales calls since the $1829 purchase, made in July 1991, and declined to buy additional V.I.P. products. According to RFG Group's marketing strategy, Ms. Birckbichler would have been a reload prospect, assigned either to the 90-day or no sale reload sales team, both of which included Mullen.
 
 
 27
 Ms. Birckbichler's testimony about the sales call was fairly detailed. She explained that she recalled the conversation clearly even five years later because she received it on her cellular phone while in the bathroom at her son's apartment. She testified that Mullen told her that she had "hit it big" in "jackpot nine." She recalled that when she expressed skepticism about winning the car, based on her prior experiences with V.I.P., he indicated that he could "do the job" for her. He also told her that he was the boss of the person who had last called her, from whom she did not purchase. She testified that he implied so strongly that she had won the car that she "couldn't infer that he meant anything other than that [she] had won the car." Finally, she testified that he coached her on what to say to the verification department when she received the call to verify her order, since "it would mean his job" if she told them that she "was promised any certain prize."
 
 
 28
 On cross-examination, Mullen's attorney asked Ms. Birckbichler if there was "a point in time when . . . you kind of realized that maybe I'm not going to win one of the big prizes?" Ms. Birckbichler responded "[y]es." She also said that she was familiar with the Publisher's Clearing House sweepstakes and understood that "everybody that enters into that thing doesn't get one of those big checks." Finally, she confirmed that a verification phone call followed one to two days after she placed each order. The verifier confirmed her name and address, the products purchased and whether any specific prize had been promised by the salesperson.
 
 
 29
 The district court concluded that the evidence on count six must leave "a reasonable doubt in a rational mind as to Mullen's specific intent to defraud Birckbichler." United States v. Mullen, at 6. The court labeled as "conclusory" her testimony that Mullen implied that she had won the car, and found that Mullen's statements that she had "hit it big" in the "jackpot" were, "without more," the mere "puffery which has become so commonplace in sales jargon." Id.
 
 
 30
 The court's analysis of the facts before it was flawed. On a motion for judgment of acquittal, the court must evaluate all of the evidence in the light most favorable to the government, Jackson, 443 U.S. at 319, and evidence must be viewed against the totality of the government's case. Monica, 295 F.2d at 401. The district court, however, appears to have viewed the evidence on this count in isolation and to have failed to make every inference in favor of the government. Although Mullen's statements to Birckbichler that she "hit it big" in the "jackpot" might, "without more," be mere "puffery," there was more on which a jury could find that Mullen had the requisite intent. The court was obliged to consider as well all of that evidence in evaluating whether a rational trier of fact could find beyond a reasonable doubt that Mullen was guilty.
 
 
 31
 The evidence showed that Mullen had been at the RFG Group for almost the full term of his 14-month employment when he called Ms. Birckbichler. The jurors heard the pitches from the pitch book and the "13 `Guaranteed to Close'm' Close$," authored by Mullen. They heard testimony that there was no contest or jackpot, that there were no sponsors, and that the calls were not prize notifications at all, but just attempts to sell extremely overpriced products. They heard that customers' photos were requested for "promotional advertising purposes," but, when received, were tacked to "mooch boards" to be laughed at by RFG employees. They heard that Mullen had laughed at the customers and their gullibility. They heard that Mullen had assisted another telemarketer, Don Ivey, in some of his more outrageous misrepresentations. In one case, Ivey pretended to be calling from a helicopter and Mullen made the whirring sound of the blades. Another time, Ivey claimed that he was calling from a submarine while Mullen provided sonar "blips" in the background. They heard Ms. Birckbichler's testimony that Mullen had implied so strongly that she had won a car that she could not help believing that she had won a car. Finally, they heard her testify that Mullen coached her on how to answer the questions from the verification department, including the warning that "it would mean his job" if she told the verifier that she was promised any particular prize. Based on this substantial body of evidence, the jury was entitled to conclude that when Mullen called Ms. Birckbichler and told her that she had "hit it big" in a non-existent sweepstakes, he knew exactly what he was doing -- misleading someone by suggesting that she had won a car and that she was somehow required to purchase overpriced air filters to claim her prize.
 
 
 32
 We recognize that all of the evidence at trial was not adverse to Mullen; the defense effectively attacked some aspects of the government's case. However, to prevail on a motion for a judgment of acquittal, a defendant needs to show more than that the government's case against him was not overwhelming or that the jury could have decided in his favor. Mullen needed to show that the evidence was "so meager that no reasonable jury could find guilt beyond a reasonable doubt." White, 673 F.2d at 301. As the list above amply demonstrates, the government introduced sufficient evidence as to count six to satisfy this rather low threshold and allow the case to be submitted to and decided by the jury. While it might be possible to construe the evidence against Mullen in such a way to find that he lacked the specific intent to defraud, in considering the Rule29(c) motion the court was required to draw all inferences in the government's favor. As already noted, when making a case based on circumstantial evidence the government need not "exclude every reasonable hypothesis other than that of guilt." Holland, 348 U.S. at 139. Using the proper standard, we conclude that the jury was not acting irrationally when it found beyond a reasonable doubt that Mullen did have the requisite intent. By granting a judgment of acquittal on this count, the court impermissibly replaced its judgment for that of the jury.
 
 2. Count 25
 
 33
 Count 25 charged Mullen with wire fraud arising out of a phone call to an unknown woman in Ohio who did not testify at trial. The support for the charge was a recording of a fragment of the sales call. The exchange lasted less than one minute. Mullen told the woman that the company had decided to target her part of Ohio, that her area was designated as a priority, and that as a result of its priority status, "they're planning on, on sending you one of the top bonuses for the entire year." He told her that "they just put together one of the biggest promotions that they've ever run . . . . tak[ing] all the best awards from our, our previous promotions, and they, they put it all into one." Mullen also told her that "[t]hey held the drawing a couple of weeks ago and your name was picked." The recording ends as Mullen begins to describe the prizes, including a 1992 Lincoln Town Car and a painting.
 
 
 34
 As the district court acknowledged, many of Mullen's statements were "arguably false or misleading." United States v. Mullen, at 7. The government's evidence tended to prove that there were no special promotions, no areas designated as a priority and that no one actually won the top bonuses. The evidence also demonstrated that customer lists were based on leads purchased from other sources, not from "drawings [held] a couple of weeks ago." The court, however, found that this snippet of conversation could not support a charge of wire fraud because the timing of the conversation was unknown. Therefore, it could have occurred at any time during Mullen's tenure at RFG Group, potentially before he recognized the fraudulent nature of the operation. See United States v. Mullen, at 8-9. Without a time frame to put the call into context, the court found that the jury could not have concluded beyond a reasonable doubt that the call occurred when Mullen had knowledge of the falsity of his statements and the requisite intent to defraud.
 
 
 35
 On this count, we agree with the district court that the evidence was not sufficient to allow a reasonable jury to conclude beyond a reasonable doubt that Mullen possessed the requisite intent to defraud. Like the court below, we rest this determination primarily on the government's inability to date the conversation. Because no time frame could be established, there is no way of knowing whether this call took place at the end of Mullen's tenure, when he surely understood the nature of RFG Group's business, or whether the call was placed soon after he began working there, when he may not have understood that his statements were false.
 
 
 36
 As we said above, fraudulent intent may be established by circumstantial evidence. In order to prove fraudulent intent in this manner, the government needed to establish that Mullen made misrepresentations and that the misrepresentations were intended to harm the customer in Ohio. "Misrepresentations amounting only to a deceit are insufficient to maintain a mail or wire fraud prosecution." Starr, 816 F.2d at 98. The government could have met its burden, however, by showing that Mullen knowingly made material misrepresentations. Smith, 133 F.3d at 743.
 
 
 37
 The government points to three pieces of evidence to support the inference that Mullen knew that his statements to the woman in Ohio were not true. First, the government directs our attention to evidence tending to demonstrate that Mullen had experience in the telemarketing industry. This evidence was supposed to support the inference that Mullen already understood the nature of RFG Group's scam when he began his job. However, the government does not point to any evidence that his previous employer, Vita Systems, was a fraudulent telemarketer. Therefore, Mullen may have come to RFG Group expecting that the sweepstakes were legitimate. The government also points to Mullen's admissions that he believed that RFG Group only gave out the cheapest prizes and that if he told a customer that they would be getting a "top bonus" he would be lying. However, these admissions were made fully two years after he stopped working for RFG Group. They shed little or no light on the state of Mullen's knowledge when he began working at RFG Group or when he made the phone call that forms the basis for count 25.
 
 
 38
 Finally, the government tries to date the conversation by focusing on the particular year of the car that Mullen described as an award. Toward the end of the short recording, Mullen says that RFG Group was giving away a 1992 Lincoln. Since Mullen worked for RFG from January 1991 through March 1992, the government finds much significance in this portion of the conversation. The government argues that Lincoln releases its calendar year models in August of the preceding year and that, therefore, a 1992 Lincoln would not be available until August 1991 at the earliest. Accordingly, the argument goes, Mullen must have made the call after at least six months' experience with RFG Group, when he must have understood the nature of the scheme and the untruthfulness of his statements.
 
 
 39
 We find this argument unavailing. First, the government offered no actual evidence as to when the models are released -- it just argues to us that we can take judicial notice of the fact that a 1992 Lincoln is available only after August 1991.[14] Second, it is quite possible that throughout 1991 RFG salespeople described a 1992 model car as a potential award. It seems as likely as not that in March 1991 Mullen was already offering the 1992 Lincoln to his customers, if that was what the script told him to say. At most, this evidence was a slim reed on which to place the timing of the call. And from that, to infer the state of Mullen's knowledge at that time requires too great an inferential stretch.
 
 
 40
 In short, in contrast to the evidence as to Mullen's state of mind when he made the March 1992 call, we agree with the district court that there was insufficient evidence to allow the jury verdict on count 25 to stand.
 
 Conclusion
 
 41
 For the foregoing reasons, we reverse the district court's grant of judgment of acquittal as to count six, affirm the district court's grant of judgment of acquittal as to count 25, and remand to the court for entry of judgment of guilty on count six based on the jury's verdict.
 
 
 
 Notes:
 
 
 [1]
 Co-defendant Joseph Meli's appeal was argued along with the instant appeal. On May 17, 1999, we affirmed Meli's conviction by summary order.
 
 
 [2]
 Prior to trial Rocco Guadagna pled guilty.
 
 
 [3]
 The five corporations were: Vita Life, Inc., which also conducted business under the names Very Impressive Products, Inc., VIP and VIP Marketing; RFG Group, Inc.; Nutrityme of New York, Inc. d/b/a Nutrityme; Rocco F. Guadagna Enterprises d/b/a Unitel National Enterprises d/b/a Unitel; and Southeast Enterprises, Inc. d/b/a Southeast.
 
 
 [4]
 For example, the following excerpt, called "The T- Bone Steak Close," which appeared in a section of the pitch book entitled "V.I.P.'s 13 `Guaranteed to Close'm' Close$," suggested that the products were priced below market when the value of the prize was added in:
 LET ME ASK YOU THIS. IF I HAD A DELICIOUS 2 POUND T-BONE STEAK FOR SALE FOR 50 DOLLARS A POUND, AND I TOLD YOU THAT IF YOU BOUGHT THE STEAK I WOULD GIVE YOU 10,000 DOLLARS CASH, WOULD YOU BE WILLING TO SPEND 100 DOLLARS ON THE STEAK AND COLLECT 10,000 IN CASH? OR WOULD YOU TELL ME THATS [sic] TOO MUCH MONEY FOR A STEAK? YOU KNOW, IT'S THE SAME WITH THIS INVESTMENT, ONLY OUR PRODUCT IS NOT 50 DOLLARS A POUND, BUT ONLY PENNIES A DAY FOR YOUR BETTER HEALTH. AND YOUR [sic] GUARANTEED ONE OF THOSE BEAUTIFUL AWARDS. YOU PRETEND I'M THE WAITER. I'LL NEED YOUR NAME AS IT APPEARS ON YOUR CC [credit card], THE EXP. DATE AND THE LONG NUMBER.
 
 
 [5]
 According to the testimony at trial, RFG Group only gave out cash refunds and big screen TVs to appease customers who threatened legal action. Only once was a new car awarded, and it was purposely given to an elderly man who made a small purchase so as to negate criticism that RFG targeted the elderly or gave substantial awards only in return for even more substantial purchases.
 
 
 [6]
 The government introduced the following pitch from a script used by the RFG Group and entitled the Front Pitch Book:
 HELLO! I'M CALLING LONG DISTANCE FOR (name on lead) . . . HELLO!! IS THIS (customer's name)!?!! HI! THIS IS (your name)! . . .
 LISTEN . . . (name) . . . I'VE GOT SOME GREAT NEWS!!!
 . . .
 YOU ARE GUARANTEED TO RECIEVE [sic], WITHOUT OBLIGATION, ONE OF THIS YEAR'S FANTASTIC BONUS AWARDS!! SO CONGRATULATIONS!! NOW THE AWARDS INCLUDE EITHER . . . A BRAND-NEW CAR, 2 THOUSAND, 5 HUNDRED DOLLARS IN CASH, A 46-INCH WIDE, BIG SCREEN TV BY SONY, 6 DAYS AND 5 NIGHTS IN BEAUTIFUL HAWAII, AND A GENUINE, 10 CAROT [sic] DIAMOND AND SAPPHIRE BRACELET! AND ONE OF THESE IS DEFINITELY YOURS, WITHOUT OBLIGATION. NOW THAT SOUNDS PRETTY EXCITING, RIGHT! ? NOW ACCORDING TO THIS, YOU'RE A VISA OR MASTERCARD HOLDER IN GOOD STANDINGS [sic]? IS THAT CORRECT? NOW SINCE THIS IS A VERY EXPENSIVE PROMOTION FOR US TO RUN, I AM LIMITED TO THE NUMBER OF PHONE CALLS I'M ALLOWED TO MAKE. SO PLEASE LISTEN CLOSELY.
 OKAY? . . .
 NOW I'M SURE YOU'LL AGREE (name), THOSE ARE SOME PRETTY IMPRESSIVE AWARDS, RIGHT? NOW SINCE THE SELECTION PROCESS IS DONE AT RANDOM, NATURALLY, I CAN'T PROMISE YOU WHICH AWARD IS YOURS. BUT YOU ARE DEFINITELY GUARANTEED AND WILL RECIEVE [sic] ONE OF THEM. AND I'M SURE YOU'LL BE MORE THAN HAPPY WITH ANY ONE OF THOSE, RIGHT?
 NOW IN ORDER TO MAKE THIS WHOLE THING POSSIBLE, THERE ARE TWO THINGS I NEED TO ASK IN RETURN ON BEHALF OF THE SPONSORS. . . .
 FIRST OF ALL (name), WE NEED A PHOTOGRAPH OF YOU WITH YOUR AWARD TO USE FOR PROMOTIONAL ADVERTISING PURPOSES, . . .
 NOW THE WHOLE PURPOSE BEHIND THIS SALES PROMOTION (name), AS I MENTIONED EARLIER, IS TO ATTRACT A FEW, NEW CUSTOMERS. WE'VE BEEN A LEADING DISTRIBUTOR OF HEALTH PRODUCTS EVER SINCE 1987. AND THIS IS HOW WE ADVERTISE. WE KNOW, FROM YEARS OF EXPERIENCE, THAT A HAPPY, SATISFIED CUSTOMER IS OUR BEST FORM OF ADVERTISING.
 At this point, the salesperson would offer three products to the customer and describe the chosen product in detail.
 
 
 [7]
 Each of the five companies had its own letter ofuarantee with slightly different prize lists. The first-time VIP purchaser received a different "bonus" prize than the first-time Nutrityme purchaser, but neither prize was randomly awarded. The first-time prize was always the least valuable of the prizes listed on the letter, usually worth about $50.
 
 
 [8]
 The letters contained registration codes such as "SE-1-4681" that told the reloader that the customer had made one prior purchase from Southeast.
 
 
 [9]
 Because of their superior sales ability, the reload sales group was also in charge of trying to sell to near customers and lapsed customers. "No salers" contacted customers who had almost placed orders and "cancel sales" contacted customers who placed orders and then canceled.
 
 
 [10]
 It is not clear if "misrepresentations" were misleading statements made by salespeople or simply deviations from the pitch book. One witness testified that Mullen described "misrepping" as "not following the pitch."
 
 
 [11]
 Prior to trial all but six of his 28 co-defendants pled guilty.
 
 
 [12]
 All references are to the redacted indictment submitted to the jury.
 
 
 [13]
 The result of the trial for the other five defendants who did not plead guilty was as follows: For two defendants, the jury returned mixed verdicts convicting on some counts and acquitting on others; for the remaining three, the court directed verdicts of acquittal for two and the jury acquitted the third.
 
 
 [14]
 This argument is advanced for the first time on appeal. Below, the government argued, essentially, that the tape spoke for itself.