**UNITED STATES,**

**v.**

**Roberta DUPRE and Beverly Stambaugh, a/k/a "Sue Stambaugh," Defendants.**

**No. 04 CR.267 DLC.**

United States District Court, S.D. New York.

Oct. 8, 2004.

Bret R. Williams, New York City, for Plaintiff.

Denis P. Kelleher, Kelleher & Dunne, L.L.P., New York City, for Defendants.

## OPINION AND ORDER

COTE, District Judge.

The Government has moved *in limine* to exclude mental health evidence that it an-ticipates defendant Roberta Dupre will offer at trial.[1] Dupre seeks to offer evidence that she was acting in good faith during the time of the fraud alleged here because of her belief that she is guided by God. For the following reasons, the motion is granted.

## BACKGROUND

On March 22, 2004, Roberta Dupre and Beverly Stambaugh were indicted for wire fraud, 18 U.S.C. § 1343, and conspiracy to commit wire fraud, 18 U.S.C. § 371. The indictment alleged that from October 2002 to February 2004, Dupre and Stambaugh operated a scheme to defraud potential investors by falsely inducing them to pay "advance fees" in order to secure the release and distribution of approximately $9 billion in frozen funds purportedly belonging to the family of former Filipino president Ferdinand Marcos. Dupre and Stambaugh allegedly promised investors a return of approximately $1 million for each $1,000 invested.

The deadline for motions was set for May 21. This deadline also triggered the provisions of Fed.R.Crim.P. 12.2(b), which states that a defendant's notice of intent to introduce expert evidence of a mental condition is due "within the time provided for filing a pretrial motion." *Id.* On September 14, Dupre's counsel sought permission to file late notice pursuant to Fed. R.Crim.P. 12.2(b)'s good cause exception. This Court granted permission that same day based on counsel's representation that he had observed a "noticeable change" in Dupre's demeanor in late July, and that subsequent meetings between Dupre and a clinical psychologist in August and early September indicated that Dupre may suffer from a mental disease.

---

1. Although the Government motion also sought to exclude mental health evidence with respect to Beverly Stambaugh, counsel for

Ms. Stambaugh withdrew notice of intent to offer such evidence on September 30, 2004.

On September 22, the Government submitted a letter requesting *in limine* rulings to prevent Dupre from relying on a mental health defense and to avoid any related jury instructions. The Government argues that the Insanity Defense Reform Act of 1984 ("IDRA"), 18 U.S.C. § 17, requires courts to exclude mental disease evidence other than that used to support a narrowly defined insanity defense. Because the defendants are not offering an insanity defense, the Government argues, mental disease evidence should be foreclosed. The Government also argues that in any event, such evidence should be excluded under Fed. R.Evid. 403.

On September 28, Dupre submitted a response contending that while the IDRA limits the use of mental disease evidence for affirmative defenses, it does not prevent defendants from introducing such evidence for the purpose of negating the *mens rea* element of an offense. Dupre argues that the testimony of a psychologist will assist the jury in determining whether she was acting in good faith, and therefore should be admitted. On October 1, Dupre submitted a written forensic psychological evaluation that documents her psychologist's findings and concludes that Dupre suffers from Bipolar Disorder with Psychotic Features and a personality disorder, both of which result in her sometimes "misperceiv[ing] important aspects of reality." The evaluation asserts that such misperceptions affect "her thinking about the investment project and her beliefs about the Lord's role and her own role in this project." *Id.*

### DISCUSSION

1. *18 U.S.C. § 17 and Mental Disease Evidence*

The relevant portion of 18 U.S.C. § 17 states:

It is an affirmative defense to a prosecution under any Federal statute that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his acts. Mental disease or defect does not otherwise constitute a defense.

18 U.S.C. § 17(a). Should the defendant pursue a defense of insanity, the defendant has the burden of proving the defense "by clear and convincing evidence." 18 U.S.C. § 17(b). The Government argues that 18 U.S.C. § 17 forecloses the use of mental disease evidence that "fall[s] short" of the statute's standards.

The Second Circuit has not addressed the question of whether the IDRA prevents defendants from presenting evidence of mental disease for the purpose of negating the intent element of a charged crime. Nonetheless, the text, structure, and legislative history of the IDRA, along with persuasive authority from other circuits, all support the conclusion that the IDRA does not prevent defendants from presenting mental disease evidence for the purpose of negating the intent element of a charged crime.

First, on its face, the text of 18 U.S.C. § 17 does not foreclose the use of mental disease evidence to negate *mens rea*. Subsection (a) defines the affirmative defense of insanity as an inability to appreciate "the nature and quality" or the "wrongfulness" of an action as a result of a "severe" mental disease or defect, and then limits affirmative defenses based on mental disease evidence to the insanity defense, stating that "[m]ental disease or defect does not otherwise constitute a *defense.*" 18 U.S.C. § 17(a) (emphasis supplied). This provision eliminates the "voli-

tional prong" of the Model Penal Code's insanity defense provision, which permitted acquittal by reason of insanity where a defendant lacks "substantial capacity ... to conform his conduct to the requirements of law" due to a mental disease or defect. Model Penal Code § 4.01 (1962); *see also United States v. Pohlot*, 827 F.2d 889, 896 (3d Cir.1987). Nowhere does the statute prevent defendants from using indicators of mental disease as *evidence* to address the question of whether the Government has met its burden of proving intent.

Second, the structure of the IDRA in relation to other federal rules demonstrates that it was not intended to prevent defendants from presenting mental disease evidence for the purpose of negating the intent element of a charged crime. At the same time that the IDRA revised the definition of insanity in 18 U.S.C. § 17, Congress contemplated revisions to Fed.R.Crim.P. 12.2, but ultimately left it untouched. *See* S. 1558, 97th Cong. (1981); S. 2669, 97th Cong. (1982). As written at that time, Rule 12.2(a) required defendants to provide notice to the Government if they intended to rely on an insanity defense at trial, while Rule 12.2(b) provided: "If a defendant intends to introduce expert testimony relating to a mental disease or defect or any other mental condition of the defendant *bearing upon the issue of guilt,* the defendant shall ... notify the attorney for the government in writing of such intention." Fed.R.Crim.P. 12.2(b) (1975) (emphasis supplied) (quoted in *Pohlot,* 827 F.2d at 899 n. 8). The Advisory Committee note accompanying this rule states that the rule's purpose is, *inter alia,* to require defendants to give notice prior to trial that they intend "to introduce expert testimony of mental disease or defect on the theory that such mental condition is inconsistent with the mental state required for the offense charged." Fed.R.Crim.P. 12.2(b), Advisory Committee Note (1975). If 18

U.S.C. § 17(a) was intended to preclude all expert testimony relating to mental disease other than that pertaining to insanity defenses, revising Fed.R.Crim.P. 12.2(b) would have been essential. That Congress considered, and rejected, bills that included proposed revisions to Fed.R.Crim.P. 12.2 indicates that 18 U.S.C. § 17(a) was not intended to disrupt the use of mental disease evidence that bears on the issue of an accused's intent.

Third, the legislative history accompanying the passage of the IDRA indicates that it was not intended to prevent defendants from presenting mental disease evidence for the purpose of negating the intent element of a charged crime. *See Pohlot,* 827 F.2d at 897–900 (canvassing legislative history). For example, the House Judiciary Committee Report accompanying a bill that was substantially similar to the Senate version that eventually became law explained the rationale behind restricting the scope of the insanity defense:

> Since the current insanity defense is derived from case law, the Committee is concerned that additional defenses based on mental disorders could be developed by the courts in order to circumvent the tighter requirements developed by Congress. Thus, the bill provides that the Committee's test constitutes the only affirmative defense based on mental disorder that will be applicable in Federal courts. Mental disorders will remain relevant, of course, to the issue of the existence of a mental state required for the offense, such as the specific intent required for certain crimes. This accords with current practice.

H.R.Rep. No. 98–577, 98th Cong., 1st Sess., at 14 (1983). The language of the Senate Judiciary Committee Report for the IDRA reflects a similar concern for the expansion of excuse-based affirmative defenses, such as a "diminished capacity" or

"diminished responsibility" defense, as opposed to the issue of *mens rea* evidence. The bill was intended to ensure that the insanity defense is "not improperly resurrected in the guise of showing some other affirmative defense, such as that the defendant had a 'diminished responsibility' or some similarly asserted state of mind which would serve *to excuse the offense* and open the door, once again, to needlessly confusing psychiatric testimony." S.Rep. No. 98–225, 98th Cong., 2d Sess., at 229 (1984) (emphasis supplied). Statements such as this accompanying the passage of the IDRA indicate that it was not intended to prevent defendants from presenting mental disease evidence for the purpose of negating the intent element of a charged crime. The Congress evidently appreciated the distinction between an affirmative defense meant to excuse a crime, and evidence offered to rebut Government attempts to meet their burden of proof on intent.

Finally, although the Second Circuit has not resolved this question, other circuit courts presented with the same question agree that the IDRA does not prevent defendants from presenting mental disease evidence for the purpose of negating the intent element of a charged crime. *See United States v. Brown*, 326 F.3d 1143, 1147 (10th Cir.2003); *United States v. Worrell*, 313 F.3d 867, 874 (4th Cir.2002); *United States v. Schneider*, 111 F.3d 197, 201 (1st Cir.1997); *United States v. Cameron*, 907 F.2d 1051, 1066 (11th Cir.1990); *United States v. Bartlett*, 856 F.2d 1071, 1081–82 (8th Cir.1988); *United States v. Twine*, 853 F.2d 676, 679 (9th Cir.1988); *Pohlot*, 827 F.2d at 890. Moreover, other district courts in New York have followed one or more of these decisions. *See United States v. Agnello*, 158 F.Supp.2d 285, 287 (E.D.N.Y.2001); *United States v. Pirro*, 76 F.Supp.2d 478, 485 (S.D.N.Y.1999).

Therefore, the IDRA does not prevent defendants from presenting mental disease evidence for the purpose of negating the intent element of a specific intent crime. Given that defendants are not foreclosed from presenting mental disease evidence towards the *mens rea* element of a charged offense, it is necessary to identify whether any elements of the charged offenses require the Government to prove intent in a way that could be meaningfully refuted by the type of mental disease evidence Dupre seeks to present.

2. *Elements of Intent in Charged Offenses*

 Dupre is charged with one count of wire fraud, 18 U.S.C. § 1343, and one count of conspiracy to commit wire fraud, 18 U.S.C. § 371. The wire fraud statute assigns penalties to anyone who,

> having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire ... communication in interstate or foreign commerce, any writings ... or sounds for the purpose of executing such scheme or artifice.

18 U.S.C. § 1343. An essential element of this crime is intent to defraud. The Government must prove that the defendant engaged or participated in a fraudulent scheme with an understanding of its fraudulent or deceptive character and with an intention to be involved in the scheme and to help it succeed with a purpose of causing actual financial harm to another. *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir.1999). Under the wire fraud statute, even false representations or statements or omissions of material facts do not amount to a fraud unless done with fraudulent intent. *Id.* However misleading

or deceptive a plan may be, it is not fraudulent if it was devised or carried out in good faith. A defendant's honest belief in the truth of representations made by her is a complete defense, however inaccurate the statements may turn out to be. Nevertheless, fraudulent intent may be proven by showing that the defendant made misrepresentations with knowledge that the statements were false. *Id.* Moreover,

> where some immediate loss to the victim is contemplated by a defendant, the fact that the defendant believes (rightly or wrongly) that he will 'ultimately' be able to work things out so that the victim suffers no loss is no excuse for the real and immediate loss contemplated to result from defendant's fraudulent conduct.

*United States v. Rossomando,* 144 F.3d 197, 201 (2d Cir.1998). Thus, intent is an essential element of the wire fraud statute.

■ The conspiracy charge also contains an essential intent element. The conspiracy statute prescribes punishment "[i]f two or more persons conspire ... to commit any offense against the United States, ... and one or more of such persons do any act to effect the object of the conspiracy." 18 U.S.C. § 371. An essential element of conspiracy is that the defendant knowingly, willfully, and unlawfully became a member of the conspiracy. Thus, the Government must prove that the defendant joined the conspiracy with an awareness of its illegal aim and purpose and with the specific intent of furthering that purpose. *See United States v. Downing,* 297 F.3d 52, 57 (2d Cir.2002). Therefore, intent is also an essential element of the conspiracy statute.

### 3. *Standards for Admitting Expert Mental Disease Evidence*

Although defendants are not foreclosed from presenting mental disease evidence to negate the *mens rea* element of a charged offense, and the charged offenses in this case contain intent elements that potentially could be countered by mental disease evidence, any proffered expert mental disease evidence must nevertheless meet the standards of the Federal Rules of Evidence. Three rules are particularly relevant: Rules 403, 702, and 704(b), Fed. R.Evid.

■■ A district court may admit the testimony of an expert if her knowledge will "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702. District courts serve a "gatekeeping" function and must ensure that an expert's testimony "rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). *See also Wills v. Amerada Hess Corp.,* 379 F.3d 32, 48 (2d Cir.2004). Like all evidence, such expert testimony must "make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence," Fed. R.Evid. 401, and may be excluded if its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Fed.R.Evid. 403. *See United States v. Mulder,* 273 F.3d 91, 101 (2d Cir.2001).

■ There are special concerns for relevance and potential jury confusion in the case of expert testimony regarding mental disease evidence offered in an attempt to negate the intent element of an offense. Testimony about mental disease should not be allowed where it is offered to support the conclusion, or will mislead the jury into concluding, that the defendant was temporarily insane, that the disease

caused the defendant to commit the crime or otherwise impaired her ability to exert volitional control, or that the disease impaired the defendant's ability to reflect on the consequences of her conduct. Admission of such testimony would run afoul of the IDRA. Where a defendant fails to meet the IDRA's definition of insanity, the defendant cannot be allowed to admit evidence that she "committed a crime because of a supposed psychiatric compulsion or inability or failure to engage in normal reflection." *Worrell,* 313 F.3d at 873 (citation omitted). On the other hand, where the testimony assists in understanding a defendant's state of mind at the time she engaged in the criminal conduct, evidence of mental disease can help the jury assess whether the Government has carried its burden of showing the requisite specific intent to commit the crime. *Id.* Therefore, psychiatric evidence must be weighed carefully to ascertain whether it would, if believed, "support a *legally acceptable* theory of lack of *mens rea."* *Cameron,* 907 F.2d at 1067 (citation omitted) (emphasis in original). For this reason, courts have excluded expert mental disease testimony that tended to show the defendant "lacked the capacity to control or reflect upon his conduct" because it constituted "inadmissible psychological or psychiatric evidence." *Brown,* 326 F.3d at 1148. In *Worrell,* 313 F.3d 867, expert mental disease testimony was excluded where the expert determined that defendant was not able to exercise control over his actions or reflect on their possible consequences. *Id.* at 875. *See also Cameron,* 907 F.2d at 1066 (evidence of the defendant's inability to reflect upon or control behavior is inadmissible). In contrast, several appellate court decisions cite with approval the following example of a permissible use of expert testimony addressed to a defendant's *mens rea.* In *United States v. Staggs,* 553 F.2d 1073 (7th Cir.1977), an expert's testimony that a de-

fendant was "a person more likely to harm himself than to think about directing his aggressions towards others" made it more probable that the defendant harbored no criminal intent toward agents who had come to arrest him for desertion. *Id.* at 1076. The defendant had picked up a gun and testified that he did so because he was thinking of injuring himself so he would not be taken back to the military. *Id.* at 1075.

■ The defendant must also demonstrate a genuine link between the proffered expert testimony and the issue of intent. For this reason, courts have excluded expert mental disease testimony that was so general that it could not explain the effect a mental condition could have on a defendant's ability to form criminal intent. *See Schneider,* 111 F.3d at 202 (defendant's chemical dependency and "major depression with probable mania" would have produced "impaired judgment"); *Cameron,* 907 F.2d at 1067 (evidence of defendant's schizophrenia did not clarify how she did not intend to distribute crack cocaine).

■ Moreover, the defendant must demonstrate that the proffered expert testimony would be helpful to the jury by commenting beyond what could be ascertained based on the testimony of laypeople. Expert testimony is properly excludable where persons of "common understanding" are "capable of comprehending the primary facts and of drawing correct conclusions from them." *United States v. Castillo,* 924 F.2d 1227, 1232 (2d Cir.1991). Consequently, district courts should not admit expert testimony that is "directed solely to lay matters which a jury is capable of understanding and deciding without the expert's help." *Mulder,* 273 F.3d at 101. For example, in *United States v. DiDomenico,* 985 F.2d 1159 (2d Cir.1993),

the Second Circuit ruled that the district court was acting properly within its discretion in a fraud case when it excluded expert psychiatric testimony that the defendant suffered from "dependent personality disorder" because the defendant's own testimony about her mental state had "covered virtually the entire ground of [the expert's proffered] testimony," *id.* at 1163, and the expert's testimony would have unnecessarily stamped the "imprimatur of a clinical label" on what is already a condition within the jury's experience. *Id.* at 1164.

▮▮▮ Finally, even if some expert mental disease testimony is permitted, experts are precluded from reaching a definite conclusion about what mental state a defendant actually possessed at the time of the offense because such testimony "poses a uniquely heightened danger of intruding on the jury's function." *DiDomenico*, 985 F.2d at 1164. Expert testimony may not "usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." *United States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999). While opinions which merely embrace an "ultimate issue to be decided by the trier of fact" are generally "not objectionable," Fed.R.Evid. 704(a), expert testimony about the mental state or condition of a defendant in a criminal case is treated differently from other types of expert testimony. *See DiDomenico*, 985 F.2d at 1164. If an expert witness testifies regarding the mental state or condition of a defendant in a criminal case, that expert may not "state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or a defense thereto. Such elements are for the trier of fact alone." Fed.R.Evid. 704(b). Thus, this rule prevents experts

from "expressly stating the final conclusion or inference as to a defendant's actual mental state at the time of a crime." *DiDomenico*, 985 F.2d at 1164.

4. *Expert Testimony in this Case*

▮▮▮ Dupre proposes to offer the testimony of a clinical psychologist in an effort to negate the *mens rea* elements of her charged offenses. In support of this testimony, Dupre submitted a lengthy forensic psychological evaluation prepared by the psychologist based in large part on six hours of clinical interviews, as well as data from a series of psychological tests, prior statements made by Dupre in connection with this case, and a review of journals written by Dupre during the time of the charged offense conduct. The evaluation describes Dupre's life history from childhood to the present as it bears on her psychological condition, the history of Dupre's religious beliefs, a recitation of Dupre's account of the events leading to her arrest and her understanding of her current legal problems, psychological findings based on a mental status exam and behavioral observations, psychological findings based on psychological testing such as the PAI (Personality Assessment Inventory), MMPI–2 (Minnesota Multiphasic Personality Inventory–2), and Rorschach (Exner's Comprehensive System), and a formal diagnosis.

The evaluation begins by describing Dupre's religious background and the development of her belief system. Dupre was raised in what she describes as a strict, Catholic family. The report describes that Dupre's mother was often emotionally and occasionally physically abusive towards her during her childhood. The report also describes successive stressful experiences throughout the course of her life, such as three divorces, losing various jobs, moving around the

country, and enduring back surgery and a hysterectomy. In the late 1970s she heard God speaking to her as she suffered a heart attack. The evaluation indicates that when her father died on June 30, 1987, "this was the point that the Lord marked as the beginning of her 'faith walk,'" wherein she "finally surrendered herself to complete trust" in God. She describes her international finance "company," Global Exchange, which is apparently the vehicle for the fraud alleged here, as having the goal of "the creation of a foundation to spread evangelism." Dupre reports that she first heard God's voice thirty-nine years ago, and that she developed the habit of "journaling" what she heard God telling her. She reportedly hears God's voice "inside her own head," except for one occasion when she heard God's voice coming from outside herself.

The evaluation also provides details about how Dupre's religious beliefs have affected her participation in the investment scheme at the heart of this case. Dupre reports becoming involved in the scheme in the Philippines in 1994, which she "attributes directly to hearing a message from God to do so." Indeed, she reports that she was specially selected by God to participate in the scheme. The evaluation describes how Dupre worked with a woman in the Philippines on the scheme, and how she "felt that there were things she was not being told," but she explains that she could not have questioned her participation in the scheme because "her conviction was that she was 'led by the Lord.'" Dupre states that the scheme is part of a "shift taking place in the financial world" where the "wealth of the wicked" will end up in the "hands of the righteous," and expresses confidence that "when the frozen funds are released, this will be the beginning of the 'end time harvest,'" which will place some of the money into the hands of the righteous.

In describing the diagnostic results from psychological testing, the evaluation provides an overall assessment of Dupre's cognitive abilities and emotional well-being. On one hand, the evaluation describes Dupre's thought processes as "quite difficult, and at times impossible, to follow, particularly when she is discussing the investment project." Dupre's testing results are apparently "noteworthy in underscoring the defensive functions of Ms. Dupre's grandiose beliefs, such that· in times of stress and distress, she is likely to cling to these ideas with increased rigidity and intensity." According to the evaluation, at such times Dupre "is likely to have difficulties separating reality from fantasy," and she may "come to hasty conclusions with only cursory attention paid to relevant information." On the other hand, the evaluation describes how Dupre is "grossly cognitively intact and of above average intelligence," as well as "clearly capable of good judgment." According to the evaluation, as a result, "at some times she is able to perceive things realistically and exhibit cognitive flexibility, while at others, she limits the information to which she attends, misperceives important aspects of reality, and exhibits rigidity in her thinking."

Pursuant to the *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition* (DSM–IV), the evaluation consequently diagnoses Dupre as having Bipolar Disorder with Psychotic Features and a personality disorder and concludes that

> Ms. Dupre's intense, pervasive religious beliefs significantly interfere with her ability to see her involvement in the 'investment project' in a realistic manner and significantly contribute to her ongoing conviction that she has been involved in a legitimate enterprise with benevolent intentions.

Nonetheless, the evaluation also stresses that Dupre's "difficulties with reality testing, while at times substantial, are not pervasive, and are currently not posing any interference at this juncture with her maintaining a basically accurate understanding of legal proceedings."

Determining whether to admit this particular type of expert testimony can be challenging due to the ethereal line prior cases have drawn between impermissible mental disease evidence addressing a defendant's inability to engage in normal reflection, and permissible mental disease evidence advancing a "legitimate" *mens rea* theory. Nonetheless, Rule 403, Fed. R.Evid., mandates that courts weigh the probative nature of evidence against factors such as its capacity to mislead or confuse the jury, and to exclude evidence where the latter factors substantially outweigh its probative qualities. On balance, the expert testimony proffered in this case demonstrates a substantial capacity to mislead the jury, while providing little additional helpful information to the jury. Much of the evaluation underscores Dupre's belief that she has been compelled to participate in the scheme by God. She claims that God instructed her to participate, and that she was being "led by the Lord" throughout her participation. Such evidence is strongly suggestive of "volitional" evidence that is foreclosed by the IDRA, as evidence of the defendant's inability to control her behavior. *See Cameron*, 907 F.2d at 1066. The presentation of such evidence to the jury creates a substantial risk that it will be used for an impermissible purpose during deliberations. Moreover, this evidence is inextricably linked to other aspects of the psychological evaluation, because it forms an important basis for the conclusions therein. Attempting to parse out objectionable components would severely undercut the basis for the testimony in the first place, and would render it unhelpful to the jury.

The evaluation also suffers from problems of generality that make it insufficiently probative to overcome the possible prejudice and confusion such testimony could cause. The analysis indicates that Dupre's condition is not all-encompassing, that she is "clearly capable of good judgment," and that her difficulties with reality testing, although at times substantial, are not pervasive. Given that she has the capacity to perceive things realistically and exhibits cognitive flexibility, the usefulness of the expert testimony in determining whether Dupre was lucid *during the course* of her participation in a complex, multi-year scheme is substantially reduced. The report's acknowledgment of the defendant's largely intact cognitive system significantly reduces any probative value the report could have on the question of whether Dupre's perception of reality was consistently clouded for such an extended period of time.

Other conclusions about the times when Dupre *does* suffer from her condition are too general to be helpful. For example, the conclusion that Dupre is vulnerable to episodes of affective disturbance and depression that "interfere with her functioning" is not helpful in determining precisely how such episodes would interfere with her functioning, and is similar to the excluded conclusion in *Schneider*, 111 F.3d at 202, that the defendant's mental condition produced "impaired judgment." Finally, the bulk of the evaluation simply restates claims made by Dupre, and consequently is unhelpful under the Rule 702 analysis of *DiDomenico*.

In sum, the report causes great concern for its capacity to mislead and confuse the jury, and to permit the defendant to put an impermissible theory of justification before the jury without meeting her burden of

presenting the affirmative defense of insanity. Moreover, it does not offer useful admissible evidence that Dupre may have been continuously affected by her condition throughout the years and in connection with the many, various tasks in which she participated with the alleged fraud. It also substantially restates evidence that can easily be developed through other sources. Therefore, since its limited probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, and its tendency to mislead the jury, the proffered expert testimony based on the psychologist's evaluation is excluded.

## CONCLUSION

The Government's request to exclude the defendant's proffered expert mental health evidence is granted.

SO ORDERED.