**UNITED STATES of America,**
**Appellee,**

v.

**Roberta DUPRE, Beverly Stambaugh,**
**Defendants–Appellants.**

**Docket Nos. 05–2223–CR(L),**
**05–2272–CR(CON).**

United States Court of Appeals,
Second Circuit.

Argued: April 5, 2006.

Decided: Sept. 6, 2006.

Colleen P. Cassidy, Federal Defenders of New York, Inc., New York, NY, for Defendant–Appellant Roberta Dupre.

Denis Kelleher, Kelleher & Dunne, LLP, New York, NY, for Defendant–Appellant Beverly Stambaugh.

Bret R. Williams, Assistant United States Attorney (Michael J. Garcia, United States Attorney, Katherine Polk Failla, Assistant United States Attorney, on the brief), United States Attorney's Office for the Southern District of New York, New York, NY, for Appellee.

Before CABRANES, SOTOMAYOR, and RAGGI, Circuit Judges.

JOSÉ A. CABRANES, Circuit Judge.

We consider here a claim of a prejudicial variance from an indictment for wire fraud under 18 U.S.C. § 1343 and the role a victim's religion may play in a sentencing judge's application of United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") § 3A1.1 (b) (authorizing increased sentences for those committing crimes against a "vulnerable victim").

Defendants Roberta Dupre and Beverly Stambaugh appeal from an amended judgment of May 26, 2005, entered by the United States District Court for the Southern District of New York (Denise Cote, *Judge*) following a jury trial, convicting each of them of wire fraud in violation of 18 U.S.C. §§ 1343 and 2[1] and conspiracy to commit wire fraud in violation of 18 U.S.C. § 371.[2] The District Court sentenced Dupre principally to 168 months of imprisonment and Stambaugh principally to 108 months of imprisonment. The defendants are currently serving their sentences.

## BACKGROUND

The jury having found the defendants guilty, we review the evidence in the light most favorable to the prosecution. *See Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The prosecution demonstrated at trial that Dupre and Stambaugh bilked investors of over $1 million through an elaborate "advance fee fraud."[3] Describing herself as

---

1. The wire fraud statute makes it unlawful for a person,
 having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, [to] transmit[] or cause[] to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice.

 18 U.S.C. § 1343. Pursuant to 18 U.S.C. § 2(a), "Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."

2. Pursuant to 18 U.S.C. § 371, it a criminal offense when "two or more persons conspire ... to commit any offense against the United States, ... and one or more of such persons do[es] any act to effect the object of the conspiracy."

3. Perhaps most notorious as an e-mail scam often emanating from West Africa, "advance fee fraud" (sometimes called "419 fraud" for

an "international financier" representing a company called "Global Exchange," Dupre told investors—over a period of approximately ten years beginning around 1994—that she was working to release frozen assets once held by the family of the late Philippines president Ferdinand Marcos. She promised that for every $1,000 an investor contributed to the "Roberta Project," Citibank in New York would pay the investor $500,000 when the project "funded." [4] Dupre spent hundreds of thousands of investor dollars on personal expenses, including the maintenance of a room for years at the Park Central Hotel in midtown Manhattan. Stambaugh joined the scheme in 2002, participating by soliciting funds, sending regular e-mail messages to investors reassuring them about the progress of the enterprise, and withdrawing invested money for her personal use.

Following inquiries by police in Montrose, Colorado prompted by an investor's complaint in February 2003, the Federal Bureau of Investigation ("FBI") took over the investigation. In September and October 2003, an undercover FBI agent posing as a money manager spoke to Stambaugh and Dupre by telephone, wire transferred $1,000 to the defendants' bank account, and then met with Dupre in person to solicit additional details. Dupre was arrested in February 2004, and Stambaugh was arrested in March 2004. The defendants were each charged with one count of wire fraud in violation of 18 U.S.C. §§ 1343 and 2 and one count of conspiracy to commit wire fraud in violation of 18 U.S.C. § 371.

At trial, the prosecution produced witnesses, including victims of the fraud who had paid thousands of dollars and received no returns, the undercover FBI agent, a manager of the Park Central Hotel, a member of the Marcos family,[5] and an FBI accountant. The prosecution also introduced exhibits including recordings of the undercover agent's conversations with the defendants, records of wire transfers and bank deposits and withdrawals, and messages sent by the defendants to victims of the fraud. Many of these messages contained religious themes or imagery. For example, one e-mail message indicated that the "Lord has told Roberta to encourage all of you and that the victory is at hand." The defense's theory of the case was that Dupre and Stambaugh believed the Roberta Project to be legitimate and, accordingly, acted in good faith, without

---

the relevant provision of Nigeria law) involves a claim that a large sum of money has been "frozen" or otherwise tied up by bureaucrats or bankers. The perpetrator asks victims to contribute money to fund the legal maneuvering, bank fees, or bribery necessary to release the money, and victims are promised spectacular returns on their investments once the money is released. *See, e.g.,* U.S. Federal Trade Commission, "FTC Consumer Alert— The 'Nigerian' Scam: Costly Compassion" (2003), *at* http://www.ftc.gov/bcp/conline/pubs/alerts/nigeralrt.htm ("According to State Department reports, people who have responded to these 'advance-fee' solicitations have been beaten, subjected to threats and extortion, and in some cases, murdered."); U.S. Dep't of State, Bureau of Consular Affairs, "Advance Fee Business Scams," *at* http:

//travel.state.gov/travel/tips/brochures/brochures1216.html (last visited Aug. 18, 2006) ("This form of fraud has and is moving swiftly to an international level."); *see also generally United States v. Patasnik,* 89 F.3d 63, 66–67 (2d Cir.1996) (describing "advance fee loan scam").

4. Another $500,000 would allegedly be paid to the person who referred each contributor of $1,000, meaning that Dupre promised to pay a total return of 1000–to–1.

5. Daniel Romualdez, a nephew of Imelda Romualdez Marcos and a son of a former Philippines ambassador to the United States, testified that there existed no Marcos family members with the names of defendants' supposed partners in the Philippines.

the fraudulent intent necessary to have committed the crimes charged.[6] *See, e.g., United States v. Regan,* 937 F.2d 823, 827 (2d Cir.1991) ("The Government is required to prove beyond a reasonable doubt that the defendant was guilty of a conscious knowing intent to defraud." (internal quotation marks omitted)).

The jury found both defendants guilty of both counts charged in the indictment—wire fraud and conspiracy to commit wire fraud. After trial, the District Court reviewed the Presentence Investigation Report ("PSR") prepared by the United States Probation Office for each defendant. Dupre's PSR indicated that her base offense level was seven and recommended the following enhancements: (1) sixteen levels because the loss exceeded $1 million, (2) six levels because Dupre defrauded more than 250 persons, (3) two levels because some victims were especially vulnerable, and (4) four levels because Dupre was the leader of an extensive criminal enterprise. The adjusted offense level of 35, combined with a criminal history category of I, resulted in a Guidelines range of 168 to 210 months of imprisonment. Stambaugh's PSR included the same findings with the exception that Stambaugh had an adjusted offense level of 31, four levels lower than Dupre, because Stambaugh was not treated as the leader of the enterprise. Stambaugh's resulting Guidelines range was 108 to 135 months of imprisonment.

The District Court rejected defendants' various challenges to the PSR and, after considering and rejecting their requests for downward departures, sentenced each

defendant to the bottom of the Guidelines range identified in her PSR.

This appeal followed.

## DISCUSSION

Defendants raise several issues on appeal, alleging: (1) the admission of certain e-mail messages that assertedly were inadmissible hearsay violated defendants' rights under the Confrontation Clause of the Sixth Amendment, (2) an abuse of discretion by the District Court when it excluded expert evidence concerning defendants' mental state, (3) insufficiency of the evidence against Stambaugh, (4) erroneous jury charges on the defense of good faith and on the need for unanimous agreement about certain facts, (5) constructive amendment of, or prejudicial variance from, the substantive wire fraud count of the indictment, (6) improper imposition of the vulnerable victim enhancement for both defendants, and (7) inappropriate enhancement of Dupre's offense level for being the leader of a complex criminal enterprise.

## I. The Admission of the "Project Nine" E-mail Messages Was Not Erroneous

■ We review evidentiary rulings for abuse of discretion, and we will vacate a conviction on the basis of an evidentiary ruling only if we conclude that there was a violation of a substantial right. *See United States v. Ebbers,* 458 F.3d 110, 123 (2d Cir.2006).

■ Defendants object on hearsay and Sixth Amendment grounds to the District Court's admission of e-mail messages sent by a group of investors, self-identified as

6. Dupre claimed to the undercover agent to "trust [her] life on" a woman named Elena Romualdez, who allegedly lives in the Philippines and spoke to Dupre regularly during the

scheme's pendency. Counsel for Dupre argued at trial that this trust established her defense of good faith.

"Project 9." The Project 9 group demanded more information about the Roberta Project and speculated that it was a fraud. In a message sent from Stambaugh's e-mail account to Roberta Project participants and signed "Roberta," defendants responded to the "Project 9" messages. Included with defendants' response were e-mail messages sent by Project 9 and the defendants, including the original message sent by Project 9, which complained that investor funds were "being used to accommodate Roberta in a luxury hotel in central New York [C]ity" and threatened to seek legal recourse if the authors' concerns were not addressed.

" 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed.R.Evid. 801(c). Although the authors of the "Project 9" messages did not testify at trial, the messages were not hearsay because they were not offered in evidence to prove the truth of the matters asserted. The prosecution offered the Project 9 messages to provide context for defendants' messages sent in response to them, messages whose admissibility is not contested. *See* Fed.R.Evid. 801(d)(2).[7] In addition, the messages served to rebut defendants' argument that they had no reason to know the Roberta Project was fraudulent. *See Smith v. Duncan*, 411 F.3d 340, 346 n. 4 (2d Cir.2005) ("[T]he mere utterance of a statement, without regard to its truth, may indicate circumstantially the state of mind ... of the declarant and is *not hearsay*."

(internal quotation marks omitted)). The messages demonstrated that defendants had received communications detailing the project's likely bogus nature.

Because the "Project 9" e-mail messages were not admitted for their truth, the Sixth Amendment's Confrontation Clause is not implicated. *See United States v. Paulino*, 445 F.3d 211, 216–17 (2d Cir. 2006); *United States v. Barone*, 913 F.2d 46, 49 (2d Cir.1990).

## II. The District Court's Exclusion of Evidence Concerning Dupre's Mental State Was Not Erroneous

■■■ Dupre challenges the District Court's refusal to admit proffered expert testimony concerning her mental state and capacity. We review this evidentiary ruling for abuse of discretion. *See United States v. Cruz*, 363 F.3d 187, 192 (2d Cir. 2004). "A district court's determination with respect to the admission of expert testimony is not an abuse of discretion unless it is manifestly erroneous." *Id.* (internal quotation marks omitted).

■■■ After concluding that the Insanity Defense Reform Act of 1984 ("IDRA"), Pub.L. No. 98–473, Title II § 402(a), 98 Stat. 1837, 2057 (codified at 18 U.S.C. § 17), does not preclude a defendant from submitting mental health evidence for the purpose of rebutting the prosecution's proof of the *mens rea* element of a specific intent crime, *see United States v. Dupre*, 339 F.Supp.2d 534, 539 (S.D.N.Y.2004)—a conclusion of law we hold is correct[8]—the

7. Pursuant to Rule 801(d)(2)(A) and (E), a "statement is not hearsay" if it is "the party's own statement" or is "a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy."

8. As the District Court correctly noted, this issue has never been addressed directly by our Court, *see Dupre*, 339 F.Supp.2d at 537, although certain of our decisions appear to

have assumed that such testimony is admissible, *see, e.g., United States v. Johnson*, 994 F.2d 980, 988 (2d Cir.1993) (discussing jury charge concerning expert testimony introduced to rebut prosecution's proof of defendant's *mens rea* ). For the reasons stated in the thoughtful opinion of the District Court, *see Dupre*, 339 F.Supp.2d at 537–39, we agree with our sister circuits that have held that the

District Court nonetheless rejected the proffered evidence pursuant to Federal Rule of Evidence 403.[9] *Id.* at 544–45. The psychological evaluation report stated that Dupre's

> intense, pervasive religious beliefs significantly interfere with her ability to see her involvement in the "investment project" in a realistic manner and significantly contribute to her ongoing conviction that she has been involved in a legitimate enterprise with benevolent intentions.

*Id.* at 543. The report also states that Dupre possessed "above average intelligence" and is "clearly capable of good judgment." *Id.* The District Court found that

> the report causes great concern for its capacity to mislead and confuse the jury, and to permit the defendant to put an impermissible theory of justification before the jury without meeting her burden of presenting the affirmative defense of insanity. . . . [I]ts limited probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, and its tendency to mislead the jury.

*Id.* at 544–45. Upon our review of the record, we conclude that the District Court did not abuse its discretion in rejecting Dupre's mental health evidence pursuant to Rule 403.

In addition, although we need not reach the issue, we share the District Court's concern that the proffered evidence might have constituted an impermissible opinion

about the "ultimate issue" of whether Dupre possessed the mental state constituting an element of wire fraud. *See* Fed. R.Evid. 704(b) ("No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto."); *Dupre,* 339 F.Supp.2d at 542–44.

### III. Sufficient Evidence Supported Stambaugh's Conviction

 Claiming that the prosecution never proved that she had the requisite knowledge and criminal intent, Stambaugh argues that the evidence in the record was insufficient to support her conviction on either count of the indictment. Stambaugh's argument is without merit. In reviewing a challenge to the sufficiency of evidence supporting a criminal conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson,* 443 U.S. at 319, 99 S.Ct. 2781. The evidence in the record easily satisfies this standard. At trial, witnesses testified that Stambaugh personally solicited money from investors—promising a 500–to–1 return—and sent messages reassuring investors of the project's legitimacy, even after Dupre was arrested in this case. The "Project 9" e-mail messages discussed above demonstrated that

9. Rule 403 states that

> [a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

IDRA does not preclude a defendant from submitting evidence of mental health for the purpose of negating the intent element of a crime, *see id.* at 539 (collecting cases); *see also, e.g., United States v. Brown,* 326 F.3d 1143, 1146–47 (10th Cir.2003) (collecting cases and agreeing); *United States v. Worrell,* 313 F.3d 867, 873–74 (4th Cir.2002) (same).

defendants had reason to doubt the legitimacy of the scheme. Stambaugh withdrew investor funds for her personal use, knew of Dupre's use of investor funds for personal use, and told investors that they "shouldn't be doing due diligence." In addition, Stambaugh accepted what she called a "personal loan" from an investor after telling him that the Roberta Project was no longer "taking funds." Stambaugh's assertion that she trusted in the Roberta Project's legitimacy and lacked an intent to defraud does not convince us that no rational juror could have believed beyond a reasonable doubt that Stambaugh knew the project for what it was—a fraud.

## IV. The District Court Properly Instructed the Jury Concerning Good Faith

■ Dupre and Stambaugh challenge the District Court's refusal to charge the jury with certain language that defendants had proposed concerning their "good faith" defense. The District Court included some language suggested by the defense but rejected other suggestions.

■ We will vacate a conviction on the basis of erroneous jury instructions if a defendant offered an accurate charge at trial and can demonstrate that the charge actually given instead caused her prejudice. *See Neder v. United States,* 527 U.S. 1, 8–15, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) (holding that erroneous jury instruction entirely omitting an element of the offense charged is reviewed for harmless error); *United States v. Abelis,* 146 F.3d 73, 82 (2d Cir.1998) ("An appellant bears the burden of showing that the requested instruction accurately represented the law in every respect and that, viewing as a whole the charge actually given, he was prejudiced." (internal quotation marks omitted)).

Here, the District Court correctly informed the jury that good faith constitutes a complete defense to charges of wire fraud. The District Court charged the jury that

> [b]ecause an essential element of the crime charged is an intent to defraud, it follows that good faith on the part of the defendant is a complete defense to this charge. Each of the defendants contends that she had a good faith belief in the program and that she believed that what she told investors was true.... However[ ] misleading or deceptive a plan may be, it is not fraudulent if it was devised or carried out in good faith.

Trial Tr., Oct. 20, 2004, at 920. In a letter to the District Court, Stambaugh requested that the jury be charged as follows:

> Stambaugh's defense is that she had no intent to commit the crimes charged and the government has failed to demonstrate her lack of good faith beyond a reasonable doubt. Ms. Stambaugh believed in 'Roberta's Project'.... Believing in the legitimacy of the project, Ms. Stambaugh assisted Ms. Dupre.

She requested further that the jury be told that "[a]t all times, Ms. Stambaugh acted at the direction of Ms. Dupre under the legitimate belief that her actions were authorized and good intentioned." We conclude that the District Court did not err, much less err in a manner prejudicial to the defendants, when it charged the jury concerning the defense of good faith. Stambaugh's requested language, the omission of which both defendants challenge on appeal, goes beyond the charge to which defendants were legally entitled and would have amounted to an instruction from the District Court that the government had not proven its case.

## V. Neither the Jury Charge Nor Any Variance From the Indictment Undermines the Convictions on the Substantive Wire Fraud Count

Count Two of the indictment—the substantive wire fraud count—forms the basis

of two issues on appeal. First, defendants argue that the prosecution's evidence at trial constructively amended or, in the alternative, impermissibly varied from the crime charged in the indictment. Second, defendants claim that the District Court's charge to the jury concerning Count Two created ambiguity as to whether the jury reached unanimity on certain factual determinations essential to a finding of guilt—specifically, a finding as to which particular wire transfer justified a guilty verdict. Because the specific wire transfer mentioned in the "to wit" clause of the indictment was not proven at trial,[10] a fact the prosecution now concedes, see Br. of Appellee at 57–58, 60, defendants claim that the ambiguity resulting from the jury charge makes it especially difficult to determine what wire transfer—if any—the prosecution proved beyond a reasonable doubt to the entire jury.

**A. There Was No Constructive Amendment of, or Prejudicial Variance from, the Indictment**

A constructive amendment of an indictment occurs when " 'either the proof at trial or the trial court's jury instructions so altered an essential element of the charge that, upon review, it is uncertain whether the defendant was convicted of conduct that was the subject of the grand jury's indictment.' " *United States v. Salmonese*, 352 F.3d 608, 620 (2d Cir.2003) (quoting *United States v.*

*Frank,* 156 F.3d 332, 337 (2d Cir.1998)); see *United States v. Ford,* 435 F.3d 204, 215–16 (2d Cir.2006); *United States v. Patino,* 962 F.2d 263, 265 (2d Cir.1992) ("An indictment is constructively amended when the proof at trial broadens the basis of conviction beyond that charged in the indictment."). By contrast, " '[a] variance occurs when the charging terms of the indictment are left unaltered, but the evidence at trial proves facts materially different from those alleged in the indictment.' " *Salmonese,* 352 F.3d at 621 (quoting *Frank,* 156 F.3d at 337 n. 5). A constructive amendment of an indictment constitutes a *per se* violation of the Grand Jury Clause of the Fifth Amendment. *Id.* A defendant demonstrating a variance, however, must prove prejudice to prevail on her claim. *Id.* We decide whether a variance between an indictment and the proof at trial is prejudicial, and thus "fatal to the prosecution," by determining whether the variance infringes on the "substantial rights" that indictments exist to protect—"to inform an accused of the charges against him so that he may prepare his defense and to avoid double jeopardy." *United States v. D'Anna,* 450 F.2d 1201, 1204 (2d Cir. 1971) (internal quotation marks omitted).

We conclude that the prosecution did not constructively amend Count Two because the evidence at trial concerned the same elaborate scheme to de-

[10]. The relevant paragraph of the indictment alleges that

> [f]rom in or about October 2002 up to and including in or about February 2004, in the Southern District of New York and elsewhere, ... the defendants, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, to wit, a scheme to defraud investors of advance fees paid to obtain the release of

> an alleged $9 billion in funds purportedly belonging to the family of former. Filipino president Ferdinand Marcos, transmitted and caused to be transmitted by means of wire ... in interstate and foreign commerce, writings, ... pictures and sounds for the purpose of executing such scheme and artifice, *to wit, DUPRE and STAMBAUGH caused an investor to wire approximately $2,000 via Western Union from Liberty Township, Ohio to New York, New York.* (emphasis added).

fraud investors as was described in the indictment. The starting and ending dates of the conspiracy noted in the indictment correspond to the conspiracy proven at trial, and the evidence at trial demonstrated that defendants misled investors into believing that defendants would eventually be able to obtain the "frozen funds purportedly belonging to the family of former Filipino president Ferdinand Marcos" described in the indictment. There was, however, clearly a variance because the particular wire transfer identified in the indictment was not proven at trial. At issue is whether the proof of a wire transfer other than that specified in the indictment prejudiced the defendants. We conclude that it did not.

The indictment alleged that Dupre ran an elaborate scheme to defraud investors, beginning "in or about 1994," that Stambaugh participated in the scheme "[s]tarting in or about October 2002," and that it continued until "in or about February 2004." The description of the scheme in the indictment put defendants on notice that the prosecution aimed to prove that defendants conspired in the Southern District of New York to fraudulently induce investors to transfer money by wire to defendants between October 2002 and February 2004.

Although the prosecution points to no specific wire transfer either received in or sent from the Southern District of New York that was proven at trial, see May 26, 2006 Letter of Assistant United States Attorney Bret Williams, at 2 (acknowledging variance but contending that prosecution provided "abundant evidence" of domestic and international wire transfers, including wire transfers to various cities from New York City), upon our own review of the record we are satisfied that the prosecution produced evidence demonstrating that Dupre and Stambaugh caused victims to wire money to the Southern District of New York in furtherance of the fraud. For example, Jane L. Clark testified that after having met Stambaugh "through the Internet," she spoke by phone in October 2002 with Stambaugh, who told Clark about an opportunity to realize a "500–to–1 return on" money. Clark testified that she then called Dupre, who claimed to have "been working on this project for … 8 years," promised 500–to–1 returns, and induced Clark to send money to Dupre by wire transfer. Clark stated that she transferred $2,000 by Western Union from Irving, Texas to New York City. In addition, Clark testified that she subsequently wire transferred more money to Dupre in New York, and the prosecution introduced into evidence Clark's receipts for the Western Union wire transfers she made. The prosecution also introduced the documents Dupre sent to Clark that purported to be letters from Global Exchange, Dupre's sham company, instructing the President of Citibank to pay Clark and her husband tens of millions of dollars. Clark testified that she "understood the principal [whose money was frozen] was in the Philippines."

Because prosecutors generally disclose exhibits and witnesses' prior statements in advance of trial, see Fed. R.Crim. Pro. 16; cf. 18 U.S.C. § 3500, the testimony of Jane Clark and the documents related to it could not have surprised the defense. The defense knew that Clark possessed documents recording multiple interstate wire transfers of money sent into the Southern District of New York. We cannot see how the prosecution's proof of the wire transfers sent by Clark to Dupre, instead of the transfer specified in the "to wit" clause of Count Two, caused any prejudice to the defendants. Knowing that Clark would be called to testify, defense counsel had every incentive to discredit her testimony in any lawful and ethical manner possible. Both

Dupre's counsel and Stambaugh's counsel conducted thorough cross-examinations of Clark. Nothing in the record suggests that the defense would have prepared any differently had the indictment specified a transfer via Western Union of $2,000 from Irving, Texas, instead of a transfer via Western Union of $2,000 from Liberty Township, Ohio. *See, e.g., United States v. LaSpina,* 299 F.3d 165, 183 (2d Cir.2002) ("A variance is immaterial—and hence not prejudicial—where the allegation and proof substantially correspond, where the variance is not of a character that could have misled the defendant at the trial, and where the variance is not such as to deprive the accused of his right to be protected against another prosecution for the same offense." (internal quotation marks omitted)); *see also United States v. Guidry,* 406 F.3d 314, 322 (5th Cir.2005) (finding no variance when gun model listed in felon-in-possession indictment differed from model proven at trial); *United States v. Loe,* 248 F.3d 449, 465 (5th Cir.2001) (discerning no "potential for . . . prejudice" in case where "three acts of mail fraud were proven at trial, whereas the indictment only charged one act"); *United States v. Von Stoll,* 726 F.2d 584, 587 (9th Cir.1984) (finding no prejudice where the "inconsistency [was] that the indictment specified that [defendant] took the money from one partner, while the proof showed he got it from the other").

Unlike cases in which multiple potential bases for conviction are presented in a single count of an indictment and the particular basis relied upon by the jury is unknown, *see United States v. Margiotta,* 646 F.2d 729 (2d Cir.1981), the prosecution here relies on a specific wire transfer not mentioned in the indictment *at all.* The indictment's "to wit" clause mentioned only one transfer, and, as noted above, all parties now agree that the prosecution did not prove that particular transfer at trial. Because neither the prosecution's summation nor the District Court's charge to the jury mentioned what specific transfer was relied upon,[11] neither we nor the defendants can know what single act substituted for that enumerated in the indictment. Nonetheless, we conclude that defendants suffered no prejudice as a result of the substitution.[12] The District Court charged the jury that it must reach a unanimous verdict, and it instructed the jury that it could

11. In addition to the testimony of Clark and other victims, the prosecution introduced business records from Western Union documenting various wire transfers that potentially could have satisfied the prosecution's burden of proof.

12. In addition to suggesting that the variance hindered their defense at trial, defendants rest another claim of prejudice on their assertion that because the specific wire transfer serving as the basis of conviction remains unknown, defendants cannot know the scope of the indictment for double jeopardy purposes; in other words, they cannot know what actions may serve as the predicate for future prosecutions. *See Berger v. United States,* 295 U.S. 78, 82, 55 S.Ct. 629, 79 L.Ed. 1314 (1935) ("The general rule that allegations and proof must correspond is based upon the obvious requirements (1) that the accused shall be definitely informed as to the charges against him, so that he may be enabled to present his defense and not be taken by surprise by the evidence offered at the trial; and (2) that he may be protected against another prosecution for the same offense."). This argument is without merit. The language in Count Two of the indictment precludes on double jeopardy grounds any subsequent wire fraud prosecution of defendants arising from the scheme described therein. The defendants cannot be indicted again for wire fraud related to the "Roberta Project," as described in the indictment. In any event, the prosecution, both at oral argument and in its supplemental briefing, has represented to us that it will not seek to obtain any additional wire fraud charges against defendants relating to the Roberta Project.

find defendants guilty of Count Two only if it found them responsible for a fraudulent interstate wire transfer.[13] Had Count Two listed all the wire transfers about which witnesses might eventually testify at trial and had the trial judge informed the jury that unanimous agreement about any one of those transfers could justify a guilty verdict, our precedent would compel a conclusion that defendants had suffered no prejudice. *See id.* at 733. This case is not materially different from those in which we have found variances to be harmless. Accordingly, we reject defendants' argument that the prosecution's proof at trial constituted an impermissible variance from the crime charged in Count Two of the indictment.

**B.** *The Jury Charge On Count Two Was Not Reversible Error*

■ Because of the variance from the indictment's "to wit" clause concerning the specific wire transfer serving as the gravamen of the offense, the District Court's charge to the jury on Count Two arguably left some doubt about what particular fraudulent wire transfer—if any—all jurors agreed occurred. The District Court charged, in relevant part, that

> [t]he government must prove beyond a reasonable doubt that the wire communication occurred within the period of the scheme charged in the indictment. The government must prove beyond a reasonable doubt that the wire communication was interstate or international. . . .

Trial Tr., Oct. 20, 2004, at 923. The District Court also included a standard instruction as to the need for unanimity:

"Your verdict must be unanimous." *Id.* at 938. The District Court did not, however, charge the jury that it must be unanimous as to the particular fraudulent wire transfer, if any, that the prosecution had proven beyond a reasonable doubt.

In several cases in which multiple predicates for guilt were offered to substantiate a single count of an indictment, we have held that as long as the jury receives a standard instruction as to unanimity, it is not reversible error if a trial judge fails to charge the jury that it must be unanimous as to the specific act that serves as the basis for a guilty verdict. *See, e.g., United States v. Peterson,* 768 F.2d 64, 66–68 (2d Cir.1985) (Friendly, J.) (affirming despite trial judge's failure to charge jury that it must be unanimous about which particular bag of drugs served as basis for conviction for possessing heroin with intent to distribute it); *United States v. Natelli,* 527 F.2d 311, 324–25 (2d Cir.1975) (affirming despite trial judge's refusal to charge jury that it must be unanimous about what particular false statement served as the basis for conviction for securities fraud); *see also United States v. Murray,* 618 F.2d 892, 898–99 (2d Cir.1980) (applying principle of *Natelli* where jury was not specifically instructed that it had to be unanimous as to which of two statutes defendants conspired to violate, but where general instruction on unanimity was given); *United States v. Remington,* 191 F.2d 246, 250 (2d Cir.1951) (holding that the requested charge on unanimity with respect to the specific basis for the offense "was right and should be given if there is a new trial; but we are not prepared to hold the failure to give it was reversible error since the substance of it was probably covered,

---

**13.** The District Court also instructed the jury that to prove venue, the prosecution must establish that "[i]n connection with Count Two, the wire fraud count, the government must prove that one interstate or international wire communication in furtherance of the scheme or artifice specified in the indictment was received in or sent from the Southern District of New York."

though not so explicitly, by the charge that the jury must be unanimous").

As we have previously observed, it would be sound practice for a trial judge to charge a jury that it must be unanimous as to what specific transaction serves as the basis of a conviction for wire fraud, but it is not reversible error if a trial judge fails to do so and provides a standard instruction as to unanimity. Accordingly, we decline to vacate the conviction for Count Two.[14]

### VI. *The District Court's Imposition of the "Vulnerable Victim" Enhancement Was Error*

 Both defendants challenge the District Court's imposition of a two-level enhancement at sentencing pursuant to U.S.S.G. § 3A1.1(b) [15] on the basis of a finding that the defrauded Roberta Project investors were "vulnerable victims." As we have observed on numerous occasions, we review a district court's findings of fact for clear error, and accord deference to its application of the Guidelines to the facts. *See, e.g., United States v. McCall,* 174 F.3d 47, 49 (2d Cir.1998) (citing 18 U.S.C. § 3742(e) and *United States v. Borst,* 62 F.3d 43, 46 (2d Cir.1995)). When deciding whether a victim was vulnerable for purposes of U.S.S.G. § 3A1.1 (b), a sentencing judge should "focus not on the likelihood or extent of harm to the individual if the crime is successful, but on the extent of the individual's ability to protect himself from the crime." *United States v. O'Neil,* 118 F.3d 65, 75 (2d Cir.1997). The Guidelines application notes state that a "vulnerable victim" is one "who is unusually vulnerable due to age, physical or mental

condition, or who is otherwise particularly susceptible to the criminal conduct." U.S. Sentencing Guidelines Manual ("Guidelines Manual") § 3A1.1 cmt. 2 (2005).

The District Court explained its imposition of the "vulnerable victim" enhancement as follows:

> There is a very strong nexus here between the scheme and the vulnerability of the victims. This scheme was imbued with religious elements. It asked participants to have faith, to accept what they were told, to not ask questions, to pray for the success of the project, and to plan on doing good works with the payout that they receive.
>
> It was described as a plan in which there would be a redistribution of wealth from the wicked to God's people. The scheme as we saw at trial rejected those who asked too many questions and who wouldn't believe and wouldn't be patient. They used a variety of methods to weed out people who would challenge ultimately or who wouldn't accept the scheme as it was designed.
>
> The defendants singled out their vulnerable victims from a larger class of potential victims. This was not a mass mailing or some mass marketing scheme. The defendants instead worked within communities of people with evangelical beliefs targeting a few and through an incentive program seeking more like-minded people.... [I]f you happen to refer another person ..., you would in addition receive [payment] for that person's investment and therefore a chain of people grew and grew within these evangelical communities.

---

**14.** It would similarly be sound practice for prosecutors to state in their summations what transfer (or transfers) they mean to rely upon, especially if, as here, it varies from the indictment.

**15.** U.S.S.G. § 3A1.1(b)(1) instructs sentencing judges as follows: "If the defendant knew or should have known that a victim of the offense was a vulnerable victim, increase [the offense level] by 2 levels."

Once they got somebody to be a contributor, they kept coming back to that person with new explanations with an urgent new need for money. So they kept tapping into the same source of victims over and over again with repeated requests. The fact that some of those who chose to contribute their money can't really be described as people of faith or as evangelicals, I don't think ultimately affects this analysis.

The defendants are the first to admit that this was a scheme or a project imbued with religious elements. The fact that some people were tempted to join simply because of a promise of extraordinary wealth doesn't, I think, affect the analysis that I have made here.

Sentencing Hr'g Tr., April 22, 2005, at 9–10.

While we recognize that a fraud grounded in religious themes may pose an especially effective threat, *see, e.g., Whitfield v. United States,* 543 U.S. 209, 211, 125 S.Ct. 687, 160 L.Ed.2d 611 (2005) (bilking by "Greater Ministries International Church" of more than $400 million), membership in religious groups cannot, standing alone, make victims "vulnerable" for purposes of the enhancement, even where a fraud involves reliance on religious themes or imagery, *see United States v. Crispo,* 306 F.3d 71, 84 (2d Cir.2002) ("Because the inquiry explores individual attributes, broad generalizations about victims based on their membership in a class are discouraged."). After reviewing the record on appeal, we are not convinced that the religious affiliation of certain victims in this case justifies a vulnerable victims enhancement.

We have no reason to believe that evangelical Christians as a class are "unusually susceptible" to fraud.[16] The application notes reiterate that the vulnerable victims enhancement is improper except in cases where defendants "should have known" of their victims' unusual vulnerability, such as "in a fraud case in which the defendant marketed an ineffective cancer cure or in a robbery in which the defendant selected a handicapped victim." Guidelines Manual § 3A1.1 cmt. 2. In contrast, "a bank teller is not an unusually vulnerable victim simply by virtue of a teller's position at a bank." *Id.*

Absent findings by the District Court that any specific victim was especially gullible because of his religion, we cannot conclude that evangelical Christian victims were susceptible to fraudulent schemes involving religious imagery in a manner analogous to how desperate cancer patients might be susceptible to con artists selling placebos.[17]

Much of the District Court's justification for the enhancement, aside from the victims' religion, essentially concerned their gullibility. Schemes such as the Roberta Project, however, inevitably attract the gullible. In addition, the rejection by defendants of potential investors who appeared likely to cause trouble and to ask questions does not indicate that the plan focused unusually intently upon the weakest victims. It appears, instead, to have

---

**16.** Although our discussion focuses on the victims identified as evangelical Christians, we note that not all victims shared that faith. In addition, certain victims were experienced investors. One victim who testified at trial, for example, is Jewish and, ironically considering the crime at issue, stated that he makes his living by producing "a newsletter that is geared to investors and traders."

**17.** Our holding does not imply that in *no* situation could a victim's religion properly be considered when deciding whether he is "vulnerable" for purposes of U.S.S.G. § 3A1.1(b), *see* note 15, *ante.* We need not, and do not, reach this broader question to decide the case before us.

been the sort of strategic decision that is essential to keeping nearly any fraudulent scheme in operation—and accordingly is not a basis for finding defendants' victims to have been "unusually" vulnerable. The enhancement exists to increase the punishment imposed on those criminals victimizing "those who are in need of greater societal protection," such as those "who, when targeted by a defendant, render the defendant's conduct more criminally depraved." *United States v. Stover*, 93 F.3d 1379, 1387 (8th Cir.1996) (quoting *United States v. Castellanos*, 81 F.3d 108, 111 (9th Cir.1996) (emphasis omitted)). From the record before us, we cannot conclude that the victims in this case were such persons.

Accordingly, we vacate the sentences of both defendants and remand to the District Court for resentencing, so that it can decide whether to reimpose the "vulnerable victims" enhancements after making new findings or to resentence defendants after calculating the appropriate Guideline ranges without the enhancement.[18] It may be that on remand the District Court can adequately explain why the victims in this case—or some subset of them—were especially vulnerable. The evidence may indicate, for example, that the repeated targeting of certain victims is analogous to that which helped to justify the vulnerable victims enhancement in *O'Neil. See* 118 F.3d at 75–76 ("[A]n important part of the scheme was the re-loading process, whereby individuals who already had been victimized by the scheme were contacted up to two more times and defrauded into sending more money to the companies.").

We caution, however, that a criminal successfully asking a fraud victim for additional money does not itself demonstrate that the victim is especially vulnerable.

**VII.** *The District Court's Imposition of a "Role Enhancement" on Dupre Was Not Error*

■ Dupre also challenges the District Court's imposition of a four-level enhancement to her offense level pursuant to U.S.S.G. § 3B1.1(a), which authorizes enhancements upon a finding that a defendant was the leader of an extensive criminal enterprise.[19] Her challenge is without merit. The evidence presented at trial demonstrated that Dupre led a scheme to defraud hundreds of investors of more than one million dollars. The scheme involved interstate and international transfers of money, bilked investors living in multiple states, and occurred over several years. Nothing in the record convinces us that the District Court erred in either its factual findings concerning Dupre's role or its application of the Guidelines to these facts.

CONCLUSION

In sum, we conclude that (1) the admission of certain e-mail messages defendants objected to as inadmissible hearsay were not hearsay and did not violate defendants' rights under the Confrontation Clause of the Sixth Amendment; (2) the exclusion of expert evidence concerning Dupre's mental state was not an abuse of discretion; (3) the prosecution produced sufficient evidence to support Stambaugh's convictions;

18. We intimate no view as to whether, if the "vulnerable victims" enhancement is not reimposed, the District Court could use its discretion pursuant to *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir.2005), to impose a sentence above the Guidelines range.

19. U.S.S.G. § 3B1.1 (a) states: "If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels."

(4) the jury charge as to the defense of good faith was not erroneous; (5) the lack of a jury instruction on unanimity as to what specific wire transfer supported the verdict is not reversible error; (6) there was no constructive amendment or prejudicial variance of the substantive wire fraud count of the indictment; (7) the "vulnerable victim" enhancement for both defendants was not adequately supported by the District Court's findings on the record; and (8) the enhancement of Dupre's offense level on the basis of her role as the leader of a complex criminal enterprise was not erroneous.

Accordingly, we affirm both counts of conviction for both defendants, and we vacate the sentences of both defendants and remand the causes to the District Court either (1) to clarify the record as to which victims of the Roberta Project, if any, were particularly vulnerable and how so, or (2) to resentence defendants without an enhancement pursuant to U.S.S.G. § 3A1.1 (b). The District Court may, at its discretion, allow supplementation of the record as it deems appropriate. Any party seeking appellate review of the decision on remand shall so inform the Clerk of this Court within ten days of that decision. Jurisdiction will then be automatically restored to this Court. *See United States v. Jacobson,* 15 F.3d 19, 21–22 (2d Cir.1994). After jurisdiction is restored, the Clerk of the Court shall set an expedited schedule for letter briefs, and the matter will then be decided by this panel.

The mandate shall issue forthwith.