UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 09-5197
(3:09-cr-00063-CMC-1)

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

   v.

DAVID DIETZ,

        Defendant - Appellant.

O R D E R

The Court amends its opinion filed August 18, 2011, as follows:

On page 8, the duplicative text of footnote 4 appended to footnote 3 is deleted.

For the Court – By Direction

/s/ Patricia S. Connor
Clerk

**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 09-5197**

UNITED STATES OF AMERICA,

                    Plaintiff - Appellee,

          v.

DAVID DIETZ,

                    Defendant - Appellant.

Appeal from the United States District Court for the District of South Carolina, at Columbia.  Cameron McGowan Currie, District Judge.  (3:09-cr-00063-CMC-1)

Argued:  May 10, 2011                    Decided:  August 18, 2011

Before MOTZ, DAVIS, and WYNN, Circuit Judges.

Affirmed by unpublished opinion.  Judge Wynn wrote the opinion, in which Judge Motz and Judge Davis concurred.

**ARGUED:** Nicole Nicolette Mace, THE MACE FIRM, Myrtle Beach, South Carolina, for Appellant.  Mark C. Moore, OFFICE OF THE UNITED STATES ATTORNEY, Columbia, South Carolina, for Appellee. **ON BRIEF:** William N. Nettles, United States Attorney, Jimmie Ewing, Robert F. Daley, Jr., Assistant United States Attorneys, OFFICE OF THE UNITED STATES ATTORNEY, Columbia, South Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

WYNN, Circuit Judge:

David Dietz appeals his convictions and thirty-five year sentence for kidnapping, carjacking, and related offenses. On appeal, Dietz contends the district court erred by making certain evidentiary rulings, denying his motion to substitute counsel, and sentencing him to an unreasonable term. We find no error and therefore we affirm.

I.

In 2005, Dietz became romantically involved with Eva Arce-Perez and moved in with her in an apartment shared with her brother Israel Sanchez, his wife Adriana Sanchez, and their children. In 2006, Dietz graduated from the University of South Carolina with a degree in criminal justice, completed the police academy, and became a patrol officer for the Columbia Police Department. However, Dietz left that position after one week apparently because he was not able to cope with the stress related to his duties. Afterwards, he worked as a South Carolina probation officer for several months, and again resigned due to stress.

Soon after Dietz moved in with Eva, he began to fight with Israel about household issues, which led to Dietz and Eva moving into their own apartment. Eva, however, moved back in with her brother and his family after she suspected that Dietz had

2

started an affair with another woman. Thereafter, Dietz aggressively sought to reconcile with Eva and pursued her by making phone calls and unannounced visits to Eva's work, church, and home.

Eventually, Eva reconciled with Dietz, became pregnant with their child near the end of 2007, and allowed Dietz to visit her at an apartment that she shared with her brother and his family. On returning to the apartment, Dietz resumed his fights with Israel. Those fights came to a head when Israel confronted Dietz about Dietz's failure to take Eva to doctor's visits and provide her with money. During that argument, Dietz became angry and pointed a gun at Israel while Israel was holding his infant son and sitting next to his other two children. After this incident, Dietz was not allowed to visit with Eva at the apartment.

But Dietz persisted in his efforts to contact and visit Eva. In May 2008, while Eva and her family were in church, Dietz called thirteen times. When Eva returned Dietz's calls, Dietz requested a visit, but Eva declined and called the police. When Eva and her family reached their apartment, Dietz was waiting outside the apartment, but he left before the police arrived a short time later. Eva reported to the police that Dietz had struck her, pointed a gun at Israel a few weeks earlier, and made numerous harassing phone calls earlier that

day.  Police officers later arrested Dietz, charging him with criminal domestic violence.[1]

Thereafter, Eva made several unsuccessful attempts to obtain a protective order against Dietz.  Eva nonetheless limited her contact with Dietz, particularly after she gave birth to their child in July 2008.  Eva feared that Dietz would forcibly take the baby from her.

Shortly before Christmas in 2008, Eva agreed to allow Dietz to visit the baby at a guarded courthouse "because there [Dietz] wouldn't be able to take [the baby] away . . . ."  The visit went as planned and without incident.  Afterwards, Eva agreed to call Dietz on New Year's Day to arrange another visit.

But a day or two after Christmas, Dietz met seventeen-year-old Jamie Burgess as she was walking to a store.  Dietz offered to give Burgess a ride and to purchase a pack of cigarettes for her.  After spending much of the day and evening at Dietz's house, Dietz and Burgess exchanged phone numbers.

A few days later, Burgess called Dietz and visited Dietz at his house with her friend Ian.  According to Burgess, she was discussing "belief in spirits and ghosts" with Ian when Dietz's demeanor changed and he threatened to shoot them.  Ian and

---

[1] Dietz was released on bail, and the charge was eventually dropped.

Burgess left a short time later, but Burgess agreed to spend time with Dietz again.

On January 1, 2009, Dietz picked Burgess up and they returned to Dietz's house to retrieve Burgess's MP3 player, which she had left there on the previous visit. Dietz then drove Burgess to a store. As they left the store, Dietz asked Burgess how she wanted to spend the day. Burgess replied that she "couldn't stay with him for too long" because she planned to spend the holiday with her family. Dietz became angry, accused Burgess of "using him," threatened to break her cell phone, and warned Burgess that she "shouldn't have done that." In response, Burgess opened the door and tried to jump out of the car but Dietz grabbed her, pulled her back into the seat, and told her to close the door. According to Burgess, Dietz then stated, "because you're using me I'm going to use you." Dietz drove to a wooded area where he demanded that "either [Burgess] was going to have sex with him or he was going to shoot [her]." According to Burgess, she "climbed into the back seat" and submitted to having sex with Dietz.[2]

---

[2] At trial, Dietz testified to a very different version of events. According to Dietz, two hundred dollars were missing from a briefcase in his house, and he confronted Burgess about the missing money during the car ride from the store. Burgess initially denied knowing anything about the money. Burgess eventually admitted taking the money, but she was unable to pay it back. After Dietz threatened to kill Burgess, she became (Continued)

Dietz then had a lengthy conversation with Burgess, which, unbeknownst to Dietz, Burgess recorded with her MP3 player. Dietz began by stating that "it was his word against [Burgess's] and no one would ever believe [Burgess]." He told Burgess, "I really don't know you enough to trust you to let you go alive." Burgess replied, "I don't want you to kill me so I don't want to tell[.]" Dietz stated later in the conversation, "I'm still not letting you off yet[.] I am still deciding what I'm gonna [sic] do with you."

Additionally, in the recording, Dietz discussed Eva, her family, and Dietz's son. At one point, Dietz told Burgess,

> I will kill anyone for my child. My ex I probably wouldn't kill nobody for her because I don't love her no more. She done f*cked me over too much. Me and her, me and her broke up. But my son to this day I will f*cking kill for my son babe.

Moments later, Dietz explained to Burgess that he had cheated on Eva and "[t]hat's why I don't f*cking see my son now. She's getting back at me, she's getting revenge on me. You know how many times I wanted to f*cking kill her for that sh*t?" During the conversation, Dietz stated to Burgess, "please don't mess up my . . . visitation" by calling the police. Dietz stated thoughts that oscillated between killing Burgess, Eva, and Eva's

---

frightened and offered to satisfy the debt with sex. Dietz "didn't initially agree with that" but ultimately "said okay."

family on one hand, and of peacefully releasing Burgess and reconciling with Eva and her family on the other hand.

After the conversation, Dietz drove to a fast food restaurant and directed Burgess to remain in the back seat. When Dietz was not looking, Burgess signaled the drive-through attendant to call police. Dietz became suspicious and drove away.

Dietz then took Burgess to his house, where Burgess made two more unsuccessful efforts to escape. While at the house, Burgess saw Dietz's gun lying near his bed. Again, Dietz forced Burgess to have sexual intercourse with him. Thereafter, Dietz held the gun and discussed various plans to kidnap Eva.

Burgess stated that Dietz ultimately "went back to planning and he got up and he started getting things together." Dietz packed "police gear," which Burgess described as a hat, a badge, a holster, and a jacket with a probation logo on the back. This "police gear" was a hodgepodge of items Dietz collected from his law enforcement positions.

Afterwards, Dietz drove Burgess to a wooded area and again forced her to have sexual intercourse, this time while he was holding his gun. Dietz then rented a hotel room for the night

of January 1 and used zip ties to tie his wrist to Burgess's before they went to sleep.[3]

The next day, Dietz continued to discuss his plans to kidnap Eva. Dietz spoke of "going to a church . . . to kidnap her." Burgess stated that she attempted to dissuade Dietz, telling him "that if he really loved [Eva] than [sic] he wouldn't want to hurt her and he wouldn't want to do this." Dietz stated that "he was going to talk to [Eva] tomorrow" and "he was going to let [Burgess] go the next day."

However, Dietz later became irate after he demanded Burgess's social security card, and Burgess told him she did not have it. He drove Burgess back to a wooded area, held the gun to her head and, "started yelling about how [Burgess] shouldn't have lied to him . . . ." Dietz forced Burgess to perform oral sex and to have sexual intercourse with him at gunpoint. "And after that [Dietz] told [Burgess] the plan was back on and he decided – he started putting his police gear back on . . . ."

Dietz then tried, without success, to track Eva's location.[4] When this failed, he drove to Eva's church with a canister of gasoline and fire cubes, intending "to burn the church down."

---

[3] In his testimony, Dietz denied ever using zip ties to restrain Burgess.

[4] At trial, Dietz admitted to placing GPS tracking devices on Eva's car and phone.

But the church was locked and according to Burgess, Dietz "said, okay, we're going to [Eva's] house."

Dressed in "police gear," Dietz drove to a wooded area near Eva's apartment and waited for Eva and her family to arrive. While there, Dietz instructed Burgess to "get [Eva's] sister[-in-law] out of the car and get Eva into the car." Dietz warned that he would shoot Burgess if she did not execute the plan as instructed, and he would shoot everyone if the police arrived.

Thereafter, Eva and her family arrived in two vehicles. Adriana drove the first vehicle, a Ford Sport Trac, in which Eva rode in the passenger's seat with three children—Eva's son and Adriana's two young boys—in the back seat. Isai Sanchez (Eva's nephew) was in the second vehicle, a Ford Explorer, along with three other adults and three children.

When the vehicles arrived, Dietz emerged with his gun drawn and ordered the occupants of the vehicles not to move. Burgess followed closely behind Dietz. While Adriana removed one of her sons from the back seat, Eva approached Dietz, trying to calm him and convince him to lower the gun. As Adriana carried her son toward the apartment, Dietz stepped in front of her, put the gun to her forehead, and demanded the keys to the Sport Trac. Adriana gave Dietz the keys, and Dietz told Eva to "get in the car." Dietz permitted Adriana to remove her other child from the backseat. In the vehicle, Dietz sat in the driver's seat

with Eva beside him and Burgess sitting on her lap and their son in the back seat. As Dietz pulled away, he fired "several shots" through the closed passenger-side window, inches away from the bodies of Eva and Burgess, into the fully occupied Explorer. The shots passed through the Explorer, shattering windows, but no one was struck.[5]

Dietz drove toward Barnwell, South Carolina, with frigid January air blowing through the broken window. Dietz would not allow Eva into the back seat to check on the baby; he sent Burgess instead. During the drive, Dietz pulled over so Eva could use the bathroom. A Barnwell police officer approached during the stop. Still cloaked in his police gear, Dietz "continued with the persona that [he] was a police officer." As a result, the police officer left the scene. Thereafter, Dietz drove to a Wal-Mart store in Barnwell that was closed. Dietz then drove "across the Savannah River Bridge to Georgia, because [he] knew . . . Augusta, Georgia, had a 24-hour Wal-Mart."

---

[5] At trial, Dietz explained that he fired the shots because he believed Isai Sanchez was raising a gun to shoot at him. Before Dietz got into the Sport Trac, he saw "Isai had something in his hand, in his pocket, that looked like a gun. It was a handle just like a gun." When Dietz "got in the [Sport Trac] Isai raised the shiny weapon-looking object"; Dietz panicked and started shooting. Isai testified that he was unarmed during the incident, but that he slid his cell phone, which illuminates, out of his pocket and lifted it to his face to call 911 as Dietz was driving away. The shots rang out as Isai raised the phone.

Dietz then rented a motel room in Marion, Georgia on the morning of January 4, 2009.

On that afternoon, the police arrived and demanded entry to the room. Dietz responded by firing two shots out of a glass pane beside the door, striking no one. During the hostage negotiations that followed, Dietz made various demands. He requested a solicitor, or Georgia state prosecutor, "to agree to not make any charges." Dietz surrendered around 8:00 a.m. the next day, after more than twelve hours of negotiations.

As a result of these events, Dietz was charged and tried in the United States District Court for the District of South Carolina for 1) kidnapping Eva, in violation of 18 U.S.C. § 1201(a)(1); 2) carjacking, in violation of 18 U.S.C. § 2119(1); 3) using a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c)(1); and 4) knowingly transporting a stolen motor vehicle, in violation of 18 U.S.C. § 2312.[6] A jury convicted Dietz of all charges, and the district court sentenced him to 300 months in prison for the kidnapping charge, with concurrent terms of 180 months for carjacking and 120 months for knowingly transporting a stolen

---

[6] Dietz was also charged with resisting a law enforcement officer in connection with an incident during his pretrial incarceration. This charge was dismissed on the Government's motion.

vehicle, and a consecutive 120-month term for using a firearm in furtherance of a crime of violence. Dietz now appeals to this Court.

## II.

On appeal, Dietz first argues that the district court erred by excluding the expert psychiatric testimony of Dr. Harold Morgan, who opined that Dietz suffered from borderline personality disorder. In a pretrial evidentiary hearing, Dr. Morgan testified that because of this condition, Dietz "could not form the specific intent to commit [kidnapping and carjacking] because it was all driven by panic and impulsivity." The district court admitted Dr. Morgan's testimony as to the carjacking charge, but excluded it as to the kidnapping charge. Dietz contends that excluding the testimony as to the kidnapping charge was error and unfairly limited his defense. We disagree.

Dr. Morgan testified that borderline personality disorder is characterized by "[i]nstability in interpersonal relationships, instability in mood and emotion, [and] instability in thinking and behavior . . . ." In situations perceived, or misperceived, as "rejection, abandonment, or . . . fear," someone suffering from borderline personality disorder may "overreact, . . . get panicky, [or] become very impulsive." Dr. Morgan opined that Dietz's misperception of a man raising a

12

gun was the "trigger that threw [Dietz] into this panic and this very impulsive behavior that from which everything else ensued." On this theory, Dr. Morgan concluded that Dietz lacked the specific intent necessary to commit kidnapping and carjacking.

Dr. Morgan, however, candidly admitted that "[a]t some point . . . [Dietz's] contact with reality began to kick in." Dr. Morgan could not pinpoint the dividing line "from the point where [Dietz] overreacted in that situation because of his misperceptions to the time that he regained some control and better understanding of the reality . . . , but it did happen, obviously." Further, the scope of Dr. Morgan's review was limited to Dietz's conduct in South Carolina; his testimony did not go to Dietz's conduct in Georgia.

The district court interpreted the kidnapping statute as requiring specific intent only as to the interstate transportation element, or at the time of crossing state lines. See 18 U.S.C. § 1201(a)(1) (requiring that the abducted person "is willfully transported in interstate or foreign commerce"). Because Dr. Morgan offered no opinion on Dietz's mental state at the time he drove from South Carolina into Georgia, the district court concluded that Dr. Morgan's testimony would not assist the jury in determining whether Dietz had the mental state required for kidnapping. See Fed. R. Evid. 702 (allowing expert testimony that "will assist the trier of fact to understand the

13

evidence or to determine a fact in issue"). Dr. Morgan's testimony was therefore excluded as to the kidnapping charge.[7] Dietz argues that this ruling was erroneous because kidnapping is a specific intent crime generally, and not only as to the interstate transportation element.

The pertinent portion of the kidnapping statute provides:

(a) Whoever unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person . . . , when—

(1) the person is willfully transported in interstate or foreign commerce . . . ;

shall be punished by imprisonment for any term of years or for life . . . .

18 U.S.C. § 1201(a)(1). "The [basic] elements of kidnapping under § 1201 are twofold: 'the kidnapped victim shall have been (1) unlawfully seized, confined, inveigled, decoyed, kidnapped, abducted, or carried away by any means whatsoever and (2) held for ransom or reward or otherwise.'" United States v. Lewis, 662 F.2d 1087, 1088 (4th Cir. 1981) (quoting Chatwin v. United States, 326 U.S. 455, 459 (1946)) (quotation marks and footnote

---

[7] On the other hand, the Government conceded that carjacking requires specific intent at the time the vehicle is taken. See 18 U.S.C. § 2119 (requiring that the motor vehicle is taken "with the intent to cause death or serious bodily harm"). Because Dr. Morgan's testimony was probative of Dietz's mental state at the time he took the Sport Trac, the district court admitted the testimony as to the carjacking charge.

14

omitted); cf. United States v. Childress, 26 F.3d 498, 501-02 (4th Cir. 1994) (describing the basic elements of subsection (a)(1) kidnapping as interstate transportation of an unconsenting victim). Subsection (a)(1)'s requirement of willful interstate transportation is one of the "separate federal jurisdictional bases for" the substantive crime defined in § 1201(a). Lewis, 662 F.2d at 1089.

Following the Insanity Defense Reform Act (IDRA), a defendant may offer psychiatric testimony to show that he acted under a mental disease or defect short of legal insanity only if the evidence "'negates an essential element of the government's *prima facie* case.'" United States v. Worrell, 313 F.3d 867, 873 (4th Cir. 2002) (quoting United States v. Cameron, 907 F.2d 1051, 1065 (11th Cir. 1990)). Stated differently, "psychiatric testimony regarding a defendant's mental condition" is admissible if it is relevant "to disprove specific intent for specific intent crimes." Id. On the other hand, IDRA abolished mental disease or defect defenses short of legal insanity that are offered merely to justify or excuse a defendant's otherwise criminal conduct. See 18 U.S.C. § 17; Worrell, 313 F.3d at 872. In short, the evidence must be offered to show the defendant "did not do it, not that he could not help it." Worrell, 313 F.3d at 874. This sort of psychiatric testimony is rarely admissible because "'[m]ental illness rarely, if ever, renders a

15

person incapable of understanding what he or she is doing.'" United States v. Pohlot, 827 F.2d 889, 900 (3d Cir. 1987) (quoting H.R. Rep. No. 98-577, at 15 n.23).

In this case, assuming, without deciding, that kidnapping under § 1201(a)(1) requires specific intent as to all elements,[8] we conclude that Dr. Morgan's testimony was not admissible to negate any element of the kidnapping charge. Although Dr. Morgan opined that Dietz was in a panicked and impulsive mental state when he abducted Eva, Dr. Morgan limited his opinion to a short temporal window, including only the time of the abduction and carjacking and a short time thereafter. Dr. Morgan stated unequivocally that Dietz "regained some control and better understanding of the reality," even though Dr. Morgan could not pinpoint the transition.

Considering that Dietz kept Eva in his custody for more than twenty-four hours after the abduction on January 3, Dr. Morgan's testimony would not negate that Dietz abducted Eva with the requisite mental state. In other words, even if Dietz did not have the requisite mental state at the moment of abduction, Dr. Morgan's testimony does not refute the evidence that Dietz formed the requisite mental state before the offense was

---

[8] We note that the operative indictment charged that Dietz "knowingly and unlawfully did seize, confine, inveigle, decoy, kidnap, abduct, and carry away" Eva.

16

complete.  Cf. United States v. Dupre, 339 F. Supp. 2d 534, 544 (S.D.N.Y. 2004) (expert's acknowledgment that the defendant "has the capacity to perceive things realistically and exhibits cognitive flexibility," substantially reduced "the usefulness of the expert testimony in determining whether [the defendant] was lucid *during the course* of her participation in a complex, multi-year scheme"), aff'd in part, vacated in part, 462 F.3d 131, 137-38 (2d Cir. 2006); cf. also United States v. Hughes, 716 F.2d 234, 239 (4th Cir. 1983) (victim was "inveigled" under § 1201(a)(1) where she consented to travel with the defendant from West Virginia to Ohio as a result of the defendant's misrepresentations but victim no longer consented after discovering his true intentions in Ohio).  Indeed, Dietz testified that he "continued with the persona" that he was a law enforcement officer—purposefully misleading the inquiring Barnwell police officer—long before he drove into Georgia.  Dr. Morgan's testimony therefore would not negate the abduction element.

Nor would Dr. Morgan's testimony negate that the abduction was for "ransom or reward or otherwise."  18 U.S.C. § 1201(a). This element is construed broadly; it is "sufficient for the government to show that the defendant acted for *any* reason which would in *any* way be of benefit."  Childress, 26 F.3d at 503 (citing Gooch v. United States, 297 U.S. 124, 128 (1936)).  Dr.

17

Morgan's own testimony undercut the theory that Dietz abducted Eva as an impulsive retreat from a threat rather than for his own benefit. During his cross-examination at the pretrial evidentiary hearing, Dr. Morgan testified as follows:

> Q: You also—did you see evidence in the reports that indicated that when [Dietz] went over to that apartment he was dressed as a police officer with a probation badge and all of that? Did you see that evidence doctor?
>
> A: Yes. He told me himself.
>
> Q: All right. And that would—could be viewed as an indication that he went over there with garb that indicated authority so that he could perhaps get people to do what he wanted, correct?
>
> A: I think that was indeed a part of it. He wanted to be in charge.
>
> Q: He wanted to be in charge. Well, in charge of his own suicide, is that—
>
> A: In charge of seeing the child. He wanted to see the child, talk to the mother, and he felt that the policeman's uniform would enable him to do that.

J.A. 79-80.[9] Dr. Morgan thus acknowledged the benefits Dietz sought from Eva's abduction. And, again, even if impulsivity initially motivated the abduction, Dr. Morgan's testimony would not negate Dietz's motivation to confine Eva for his own benefit once he regained touch with reality. Accordingly, Dr. Morgan's

---

[9] Citations herein to "J.A." refer to the Joint Appendix filed by the parties. Citations to "S.J.A." refer to the Supplemental Joint Appendix.

testimony was inadmissible to negate that Dietz abducted Eva "for ransom or reward or otherwise." 18 U.S.C. § 1201(a).

Finally, Dr. Morgan's testimony was plainly irrelevant to whether Dietz willfully transported Eva from South Carolina to Georgia. Because Dr. Morgan limited his opinion of Dietz's mental state to the temporal proximity of the abduction and carjacking, the testimony had no relevance to Dietz's mental state at the time he drove across state lines.

In sum, Dr. Morgan's testimony would not negate any element of the kidnapping charge even if each element required specific intent. The evidence could only have served as a prohibited diminished capacity defense and was therefore properly excluded.

### III.

Dietz next argues that the district court abused its discretion by admitting two categories of evidence under Federal Rule of Evidence 404(b): 1) Dietz's history of domestic violence with Eva and her family; and 2) the sexual assaults on Burgess. Dietz argues that the Rule 404(b) evidence was irrelevant to the charged crimes, needlessly cumulative, and unfairly prejudicial. We disagree.

Rule 404(b) is "'an inclusive rule, admitting all evidence of other crimes or acts except that which tends to prove *only* criminal disposition.'" United States v. Powers, 59 F.3d 1460,

19

1464 (4th Cir. 1995) (quoting United States v. Percy, 765 F.2d 1199, 1203 (4th Cir. 1985)). Evidence is admissible under Rule 404(b) if it is: 1) relevant to show something other than character, such as motive, intent, or plan; 2) necessary to prove either an element of the crime charged or relevant context; and 3) reliable. United States v. Byers, ___ F.3d ___, ___, 2011 WL 1718895, *6 (4th Cir. May 6, 2011). "Evidence admissible under Rule 404(b) must still meet Rule 403's requirement that its prejudicial value not outweigh its probative value." United States v. Chin, 83 F.3d 83, 88 (4th Cir. 1996). The district court's decision to admit evidence under Rule 404(b) is reviewed for abuse of discretion and will not be reversed unless it is "arbitrary and irrational." Id. at 87 (quotation marks omitted).

Dietz first complains that evidence that he pointed a gun at Israel during April 2008 was inadmissible under Rule 404(b). This evidence demonstrated to the jury that Israel and Dietz had had confrontations approaching the brink of violence prior to the charged crimes. The April 2008 confrontation showed Dietz's motive and intent to use deadly force during the January 3 incident to ensure that Israel and the rest of Eva's family would comply with his demands. The evidence also tended to show that Dietz took the keys from Adriana through intimidation, by brandishing the gun, contrary to Dietz's assertion that he

20

politely requested the keys.  See 18 U.S.C. § 2119 (requiring that a motor vehicle is taken from another "by force and violence or by intimidation").

Similarly, evidence that Dietz was arrested for criminal domestic violence on May 3, 2008 was relevant to Eva's non-consent to traveling with Dietz on January 3, 2009.  That Dietz struck Eva on her back while she was pregnant and made harassing phone calls to Eva while she was in church—compelling Eva to call police and leading to Dietz's arrest—showed, at a minimum, that Eva sought to keep her distance from Dietz.  This evidence was therefore probative of the abduction element of kidnapping.

Further, the domestic violence evidence was not needlessly cumulative or unfairly prejudicial under Rule 403.  Although multiple witnesses testified about Dietz pointing a gun at Israel and about Dietz's arrest for criminal domestic violence, many of the testifying witnesses were members of Eva's family who were present during the January 3 incident.  Dietz's prior acts of violence against, or known to, these witnesses were directly probative of whether Dietz achieved the abduction and carjacking by threat of deadly force and intimidation.  We cannot conclude that the "probative value [of the domestic violence evidence was] substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ."  Fed. R. Evid. 403.

Dietz's complaint about the sexual assault evidence is similarly unavailing. Rule 404(b) places limits on "the admission of other acts extrinsic to the one charged." Chin, 83 F.3d at 87. "[A]cts intrinsic to the alleged crime," conversely, "do not fall under Rule 404(b)'s limitations on admissible evidence." Id. at 87-88. A prior act is intrinsic to the charged criminal act if it is "inextricably intertwined or both acts are part of a single criminal episode or the other acts were necessary preliminaries to the crime charged." Id. at 88 (quotation marks omitted).

Here, the evidence showed that Dietz sexually assaulted and threatened to kill Burgess to establish control over her. The first sexual assault occurred on January 1, 2009, after Dietz became angry because he believed Burgess took advantage of him. Dietz responded by driving Burgess to a wooded area and sexually assaulting her. Burgess testified that she did not feel free to leave and that she feared Dietz. Dietz brandished the gun and became even more threatening during subsequent sexual assaults. Accordingly, this evidence showed that Dietz used the sexual assaults to intimidate and establish control over Burgess.

Ultimately, of course, Burgess became an unwilling accomplice in the kidnapping and carjacking. Absent the ability to control Burgess's actions through fear and intimidation, created in part by the sexual assaults, Dietz likely would have

22

been unable to enlist Burgess as an accomplice. The sexual assaults, which helped to create control over Burgess, were therefore "necessary preliminaries to the crime[s] charged." Id. This evidence was accordingly not subject to the strictures of Rule 404(b).

For similar reasons, even if it had been subject to Rule 404(b), the sexual assault evidence would nonetheless be admissible to show plan and intent. Because the evidence clearly showed that the sexual assaults instilled fear in Burgess and permitted Dietz to dictate her actions, this evidence was relevant to show that Dietz planned and intended to use Burgess during the kidnapping and carjacking. Indeed, after several of the sexual assaults, Dietz made comments to Burgess such as, "I am still deciding what I'm gonna [sic] do with you." S.J.A. 59. When Dietz decided on the kidnapping, he expected Eva and her family to arrive as a group, so he instructed Burgess "to get the people away from Eva and get Eva to him." J.A. 284. Dietz used the sexual assaults to establish dominance over Burgess and to make her an unwilling accomplice in his plan to kidnap Eva. This evidence therefore would have been admissible to show plan and intent even if Rule 404(b)'s limitations applied.

Dietz lastly contends that, pursuant to Rule 403, the sexual assault evidence was needlessly cumulative of a letter

Dietz wrote prior to January 3, 2009. In the letter, Dietz stated that Burgess "is not my willing accomplice, but she has been forced to help me through fear of her life. I will kill her if she refuses my demands." J.A. 450. The letter would have left more questions unanswered about Burgess's involvement than it answered. The sexual assault evidence explained how Burgess came to be under Dietz's control. We agree with the district court that the sexual assault evidence was "necessary to provide context relevant to the" kidnapping and carjacking charges.

IV.

Dietz next argues that the district court abused its discretion in denying his motions to substitute counsel and his attorney's motion to withdraw. We disagree.

At various points throughout the trial proceedings, Dietz informed the district court that he was dissatisfied with defense counsel.[10] First, on August 4, 2009, Dietz wrote to the

---

[10] Dietz complained at a pretrial status conference on June 2, 2009, which, not involving a motion to substitute counsel, was a harbinger of subsequent conflicts between Dietz and defense counsel. Defense counsel had provided Dietz's medical records to Dr. Morgan and had contacted other individuals in connection with the case without Dietz's prior approval. Dietz felt as though he was "not really being represented by" defense counsel and that defense counsel was "actually working against" Dietz. Therefore, Dietz asked that defense counsel be required
(Continued)

24

district judge, complaining that defense counsel had raised his voice in a discussion concerning Dietz's mental evaluation, making Dietz feel "uncomfortable heeding [defense counsel's] legal advice from this point on."  Dietz further asked that defense counsel be "removed from [his] case."  J.A. 39.  The district court heard and addressed Dietz's concerns at a pretrial motions hearing.  Primarily, Dietz distrusted defense counsel because he did not always explain to Dietz why he was making certain tactical decisions.  But in the end, Dietz stated:  "I think we can work it through."  J.A. 45.  Accordingly, Dietz withdrew his motions to proceed pro se and to substitute counsel.

Dietz had another conflict with defense counsel during a pretrial evidentiary hearing.  Between Eva's direct and cross-examinations, the district court held an <u>ex</u> <u>parte</u> hearing at defense counsel's request.  Defense counsel explained that Dietz requested a particular line of questioning, and defense counsel responded that he "may or may not ask it."  J.A. 402.  Dietz then retorted:  "Well, you'll be sorry."  Later during Eva's

---

to obtain Dietz's signed approval before making future decisions concerning his case.  The district court denied Dietz's request for prior approval, instructing Dietz that defense counsel "is not bound to have to have your permission to properly prepare what he thinks needs to be done in your case."  J.A. 33-35.

examination, Dietz stated: "I better not lose this case." When defense counsel asked what Dietz meant, Dietz replied, "Use your imagination." J.A. 403. Taking these statements as threats, defense counsel moved to withdraw.

Responding to the district court, Dietz denied making all of the alleged statements, or intending any of them to be threatening, and he expressed frustration that defense counsel was not listening. Dietz believed that, because of the problems he was having with defense counsel, "he's not going to be able to effectively try this case." J.A. 404. The district court elicited an apology from Dietz and proposed a solution to the conflict:

> [W]hen [defense counsel] asks questions, he can check them off. And then he can hand [Dietz] back the paper. And if there are some that weren't checked off and [Dietz] think[s] that they should have been asked, then at the next break [Dietz] can bring that to [the court's] attention.

J.A. 407. When Dietz agreed to this proposal, the district court ruled that defense counsel lacked a basis to believe he was being threatened, or any basis on which to withdraw. Therefore, the motion was denied.

Finally, Dietz raised two additional complaints about defense counsel during trial. Dietz complained that defense counsel did not object to questions implying that Dietz was terminated as a probation officer for "being overly aggressive,"

26

and that he was convicted for criminal domestic violence. Dietz believed those questions lacked an evidentiary basis. Because defense counsel did not contemporaneously object, Dietz complained that defense counsel was not "zealously representing" him. J.A. 810.

However, Dietz was unaware that defense counsel previously requested a sidebar conference in which he moved to strike the testimony about Dietz's "overly aggressive" behavior as a probation officer. The district court overruled the objection and informed Dietz that his objection had been preserved in the record by defense counsel's motion to strike. As to the criminal domestic violence issue, the district court explained that there had been no evidence introduced that Dietz was convicted. Moreover, Dietz was free to offer evidence on the issue during his own case-in-chief.

Dietz argues that the cumulative effect of his conflicts with counsel impeded his ability to present an adequate defense, and that the district court abused its discretion by refusing to allow a substitution of counsel. In evaluating whether the district court "abused its discretion in denying a defendant's motion for substitution, we consider three factors: 'Timeliness of the motion; adequacy of the court's inquiry into the defendant's complaint; and whether the attorney/client conflict was so great that it had resulted in total lack of communication

27

preventing an adequate defense.'" <u>United States v. Mullen</u>, 32 F.3d 891, 895 (4th Cir. 1994) (quoting <u>United States v. Gallop</u>, 838 F.2d 105, 108 (4th Cir. 1988)).

First, the timeliness factor weighs in Dietz's favor because he moved early in the proceedings to replace defense counsel. However, the second and third factors clearly weigh against permitting a substitution in this case.

As to the second factor—adequacy of the court's inquiry—the district court went out of its way to mediate conflicts between Dietz and defense counsel. As to each of the three conflicts raised during the proceedings, the court thoroughly heard Dietz out of the jury's presence, in open court, and on the record. Further, the court proposed a strategy that permitted defense counsel to exercise his independent professional judgment, while also allowing Dietz to voice his concerns. The district court's inquiry into Dietz's complaints was adequate by any measure.

Most importantly, there is no indication that "the attorney/client conflict was so great that it had resulted in total lack of communication preventing an adequate defense." <u>Id.</u> Generally, the nature of the conflict between Dietz and defense counsel was that defense counsel made certain tactical decisions without Dietz's agreement or prior approval. Dietz's dissatisfaction with defense counsel's tactical decisions does not indicate a lack of communication. To the contrary, Dietz

was very engaged in his defense throughout the proceedings, and defense counsel ably conducted Dietz's lengthy direct examination. See United States v. Hanley, 974 F.2d 14, 17 (4th Cir. 1992) (finding no total lack of communication where defense counsel vigorously cross-examined government witnesses and appropriately conducted the defendant's direct examination). In sum, this argument lacks merit.

V.

Finally, Dietz contends that his thirty-five year sentence is unreasonable because defendants in South Carolina's courts receive lower sentences for similar conduct. Specifically, he relies on South Carolina cases, see State v. Young, 378 S.C. 101, 661 S.E.2d 387 (2008); Pelzer v. State, 378 S.C. 516, 662 S.E.2d 618 (Ct. App. 2008), to contend that his federal kidnapping sentence should have been "twenty years or less." We disagree.

"In reviewing any sentence, 'whether inside, just outside, or significantly outside the Guidelines range,' we apply a 'deferential abuse-of-discretion standard.'" United States v. Carter, 564 F.3d 325, 328 (4th Cir. 2009) (quoting Gall v. United States, 552 U.S. 38, 40 (2007)). We first determine whether the district court committed any procedural error such as "'failing to calculate (or improperly calculating) the

29

Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to explain the chosen sentence—including an explanation for any deviation from the Guidelines range.'" Id. (quoting Gall, 552 U.S. at 51). If there is no procedural error, we "then consider the substantive reasonableness of the sentence imposed," "tak[ing] into account the totality of the circumstances, including the extent of any variance from the Guidelines range." Gall, 552 U.S. at 51.

Dietz does not argue that the district court committed any particular procedural error and, having thoroughly reviewed the record, we find none. The district court calculated Dietz's total offense level at 43, his criminal history category at I, and the resulting Guidelines range of life imprisonment. After articulating the relevant characteristics of this case and this defendant, the district court imposed a variance sentence of thirty-five years. See 18 U.S.C. § 1201(a) (authorizing, for a kidnapping that does not result in a death, any term of years or life imprisonment). Dietz's thirty-five-year sentence is comprised of 300 months (twenty-five years) on the kidnapping conviction, and a consecutive sentence of 120 months (ten years) for using a firearm in furtherance of a crime of violence. The district court found a thirty-five year sentence appropriate for

30

deterrence, to account for the seriousness of this crime, and to ensure mental health treatment for Dietz.

Relying on sentences imposed in similar South Carolina cases, Dietz essentially argues that the extent of the variance is not large enough. We recently rejected a similar argument because a central aim of the Federal Sentencing Guidelines is to eliminate sentencing disparities among <u>federal</u> defendants. <u>See</u> <u>United States v. Clark</u>, 434 F.3d 684, 686-87 (4th Cir. 2006). The Guidelines, we explained, are not concerned with disparities between state and federal defendants. <u>Id.</u> at 687 ("Indeed, concurrent jurisdiction in federal and state fora contemplates and accepts that there may well be different sentences imposed for similar or identical offenses by the two different justice systems."). To accord weight to sentences imposed by state courts would foster disparities among federal defendants, whose federal sentences would vary depending upon the state in which they committed their federal crimes. Thus, as in <u>Clark</u>, we reject Dietz's invitation to look to state law in analyzing the reasonableness of Dietz's federal sentence. <u>See id.</u>

31

## VI.

In sum, we find no error in Dietz's convictions or sentence. Accordingly, the judgment of the district court is affirmed.

<u>AFFIRMED</u>